No. 101,799

STATE OF KANSAS, *Appellee*, v. ALESIA WARRIOR, *Appellant*.

(277 P.3d 1111)

 Opinion filed
May 11, 2012. 

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Alesia Warrior (Warrior) was convicted by a jury of the premeditated first-degree murder of her husband, in violation of K.S.A. 21-3401(a), and conspiracy to commit first-degree murder, in violation of K.S.A. 21-3302 and K.S.A. 21-3401. Warrior received a controlling hard 50 life sentence. In this direct appeal, she argues: (1) statements she made to law enforcement officers while she was hospitalized were the result of a custodial interrogation and should have been suppressed because she had not been read her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966); (2) the trial court abused its discretion in denying Warrior's motion for new trial in which she alleged the State failed to disclose exculpatory evidence that pertained to a prior juvenile adjudication of a key prosecution witness; (3) the trial court erred in allowing the State to present hearsay testimony regarding statements made by the victim, Warrior's husband, indicating his belief that his marriage was in trouble; (4) the trial court erred in giving a deadlocked jury instruction prior to deliberations; (5) Kansas' hard 50 sentencing scheme under K.S.A. 21-4635 is unconstitutional; and (6) cumulative error requires reversal of Warrior's convictions and remand for a new trial.

We reject each of these contentions and affirm Warrior's convictions and sentence.

## FACTS AND PROCEDURAL BACKGROUND

The State's theory was that Warrior, Darell Rodgers, and Jamar Moore conspired to murder Warrior's husband, Jeremy Warrior (Jeremy). As evidence of motive, the State presented testimony regarding marital discord between Warrior and Jeremy and established that Warrior and Rodgers were having an extramarital affair. Financial gain was an additional motive; after Jeremy's death, Warrior received benefit payments in excess of $335,000 from life insurance policies she took out a few months before the murder.

The murder occurred in the predawn hours of April 23, 2005, as Warrior drove Jeremy to work. Typically, Jeremy would drive himself to work, but Warrior drove him that day. The reason for the change of routine, according to Warrior, was that Jeremy's car needed a new headlight, and she planned to take his car to a Firestone store to have the light replaced. The State cast doubt on this explanation through the testimony of the manager of the Firestone store. The manager told the jury that his store employees had broken the car's headlight when it had been in for repairs before Jeremy's death. The store had ordered a part and was planning to replace the headlight at no charge, but the part had not arrived before the day of Jeremy's murder.

Warrior told the jury she had no part in planning the murder and did not know who committed the crime. According to Warrior between 5 a.m., and 5:30 a.m., the couple got into Warrior's car, a dark blue Nissan Altima, with Jeremy in the passenger seat and Warrior in the driver's seat. As they were about to crest a hill, the driver of the vehicle ahead of them, a sport utility vehicle (SUV), applied the brakes. Then, as Warrior and Jeremy drove up slowly, "someone came running towards the car" and fired a gun. Warrior testified she only heard one shot. The next thing she knew, she was in the hospital. As a result of the shooting, Warrior's spinal cord was damaged, and she was paralyzed from the waist down. Jeremy received multiple gunshot wounds, at least two of which could have caused his death.

Officers were dispatched to the crime scene around 5:34 a.m. Officers came upon the blue Nissan crashed into a ditch in the

neighborhood, not far from the home Warrior shared with Jeremy. Jeremy was still and unresponsive, and Warrior was injured and moaning. Officers found bullet holes in the passenger window. There were no bullet holes in the driver's side door, but a bullet went into the right side of the driver's headrest near the passenger's seat and exited through the back of the driver's headrest. Two bullets entered the passenger's side of the car and exited out the rear door on the driver's side. A forensic pathologist testified that the bullets that hit Jeremy entered the right side of his body and that the shooter would have been outside and in front of the passenger's side window.

Neighbors testified to seeing Warrior's car and an SUV, which was described as a light-colored vehicle. One neighbor testified the car's lights were off when he first saw it, but the lights later came on. Another neighbor saw a person with a gun running up to the SUV and getting inside. He was able to describe what the person wore.

Moore, a codefendant in this case, testified pursuant to plea negotiations. Moore was not arrested for Jeremy's murder until 3 years after Jeremy died, when Moore confessed. Up to that point, when officers questioned him, Moore generally denied any involvement. In his earliest statements to officers during the initial investigation, he relayed various versions of events, including a version in which Rodgers was involved in the attack, but the shooter was a person named "Syan Crawford." Moore even identified Crawford in a photo lineup. Years later, when Moore decided to confess, he explained he was coming forward because Warrior and Rodgers had promised to pay him from the insurance proceeds, but they never did. "[I]t was on my conscience and I got tired of protecting people that never really cared about me," he explained.

Moore's testimony provided details regarding the planning of the murder and the shooting. He testified that he had known Rodgers for 8 or 9 years and first met Warrior in February 2005. In late March or early April 2005, Warrior asked Moore if he wanted to "kill somebody to make a couple thousand dollars." Neither Rodgers nor Warrior mentioned the identity of the intended victim, and no other details were discussed at that time. But a few weeks later,

on the night before Jeremy's murder, Rodgers explained that Jeremy, Warrior's husband, was to be the victim. Moore testified that Rodgers and Warrior went over "how it was supposed to be done." The plan was to kill Jeremy and shoot Warrior in the leg. Rodgers persuaded Moore to drive what Moore described as a "cream-colored" SUV, which previously had been rented by Warrior, to the place where Rodgers would commit the murder.

Moore testified that between 2 a.m. to 3:30 a.m., Warrior drove to her home in her car while Rodgers and Moore followed in the SUV. When they arrived in Warrior's neighborhood, Moore parked down the block from Warrior's home to wait until it was time for Jeremy to leave for work.

After waiting about 15 to 20 minutes, Rodgers used his cell phone to call Warrior and to ask her "what was taking so long." Moore heard Warrior's reply, in which she said, "I am trying to hurry it up." Five minutes later, Rodgers got out of the SUV and hid behind some trees in a yard, holding the gun at his right side.

After another 5 or 10 minutes, Moore saw Warrior driving her car up the street, and as she got closer to them, she "hit the lights," turning off the headlights. According to Moore, this was a prearranged signal. At that point, Rodgers ran up to Warrior's car and fired six gunshots into it. Moore immediately drove the SUV up the street a little way, as Rodgers came running and jumped inside.

Much of the other incriminating evidence presented in the trial came from Warrior's statements to law enforcement officers. After the shooting, officers questioned Warrior on four occasions during her hospitalization. Warrior did not receive *Miranda* warnings at any of these interviews. Greg Lawson, a detective for the Kansas City, Kansas, Police Department, testified about several statements made by Warrior, and the jury heard audio recordings of the interviews.

The first meeting with Warrior occurred in the intensive care unit at the hospital on April 26, 2005. Warrior explained she was driving Jeremy to work when they came upon a red SUV with its taillights on. She said two Hispanic men jumped out of the SUV—one out of each side of the back seat—and approached her car on opposite sides. Warrior described the men as short in stature and

about the same age as her and Jeremy—late 20's or early 30's. Warrior did not remember seeing or hearing any gunshots. She denied having an affair or experiencing any major problems in her marriage.

During this first interview, Warrior also indicated she had been at a friend's apartment the night before the incident, and Rodgers and Moore were there as well. Warrior only casually mentioned Rodgers, claiming he was a close friend of the person who lived at the apartment. Warrior told the officers she left her friend's around 1 a.m. and called Jeremy to tell him she was on her way home.

After the first interview, Detective Lawson inspected Warrior's telephone records and discovered numerous calls between Warrior and Rodgers. Of particular interest, on April 23, 2005, there were calls from Rodgers to Warrior just minutes before Jeremy's murder. Also, the records reflected calls from Warrior to Rodgers that morning at 4:57:00 a.m., 4:57:17 a.m., and 4:57:28 a.m. Between February 1, 2005, and April 23, 2005, there had been 52 calls between Rodgers and Warrior at Warrior's work telephone number. In addition, during Warrior's hospital stay after the shooting, there were three telephone calls from her hospital room to Rodgers' mother's telephone.

Officers returned a second time to the hospital on April 30, 2005, and questioned Warrior in her hospital room. They told her to tell them if she got tired during the interview and wanted them to leave. Detective Lawson testified that this interview only lasted 30 minutes and was not recorded. They indicated to Warrior that there were "things that we needed to get through in order to find a motive" and cover "all of our bases." The officers told Warrior that they did not want to embarrass her, but they had information indicating the possibility she was having an affair with Rodgers. She denied having an affair, and the officers left the room at Warrior's request.

The officers continued their investigation, speaking with other witnesses and gathering more information. In addition to discovering telephone calls between Rodgers and Warrior both before and after the shooting, the officers also learned that Rodgers had visited Warrior in the hospital. According to Detective Lawson, the

officers had "strong cause" to believe Rodgers was somehow involved and wanted to hear the truth from Warrior. Thus, on May 3, 2005, the officers returned to the hospital to interview Warrior a third time. Warrior's sister, mother, and aunt were periodically present in the hospital room while officers conducted the interview.

During this third interview, which was recorded, Warrior admitted to the officers she had an affair with Rodgers. She said that she was falling in love with Rodgers and that it caused problems with her husband because she was staying out late at night. Jeremy did not know about the affair, but he had his suspicions. Warrior told the officers that Rodgers got angry when Jeremy called her cell phone; on one occasion, about a month before the shooting, Rodgers got so angry he broke Warrior's cell phone with his hands. In the month before the shooting, Warrior would routinely pick up Rodgers in the morning at his mother's apartment and would drive him to her place of employment, where Warrior would get out and leave the car with Rodgers for the day. Rodgers would pick up Warrior at the end of the work day, they would spend some time together, and Warrior would return home alone.

Warrior indicated that on the day before the shooting, she went to pick up Rodgers, but Rodgers had somehow acquired a gold SUV from a friend and wanted to drive her to work in it. After work, Rodgers also picked her up in the SUV. Later, Rodgers dropped Warrior off at her car, and she returned home alone around 7 p.m. Then, Warrior told Jeremy she was going out with friends, and she went to a friend's apartment. Rodgers and Moore arrived in the gold SUV. Warrior said she left the apartment after 1 a.m., but before she left, Jeremy had tried to call her several times. This upset Rodgers, who told her not to answer her cell phone. Nevertheless, Warrior talked to Jeremy and told him she was on her way home. Warrior told the officers she had not wanted Jeremy to know about Rodgers because she loved Jeremy and had not wanted to hurt him.

Warrior told the officers that when she got home, she and Jeremy talked for 30 to 40 minutes. In the morning, they showered and had sex before getting into Warrior's car. When they drove up

the street, Warrior saw brake lights ahead on a gold SUV. Then, she saw Rodgers exit the passenger's side of the SUV and run to the passenger's side of her car. In this version of events, Warrior indicated she did not see a gun, but she heard one gunshot. After that gunshot, she felt pain and experienced a "floating" sensation.

Warrior told the officers that Rodgers had called her in the hospital to see how she was doing. He had also asked if he could visit Warrior, who said, "Yes." Warrior's sister brought Rodgers up to the hospital room. When the sister left the couple alone for a short time, Rodgers apologized for shooting Warrior. Warrior told the officers that Rodgers did not explain why he shot Jeremy, but he told her not to talk to police. When asked about Rodgers' telephone call to Warrior on the morning of the shooting, Warrior explained she had not answered his incoming call, but she had immediately called Rodgers back. She said Rodgers called because he wanted to know whether she was coming to see him that day.

As the officers were leaving the hospital room, Warrior asked Detective Lawson to come back in. She then told Lawson she had rented the SUV for Rodgers. According to Warrior, she wanted to tell the officers about the SUV because she did not want them to think she was involved in the attack.

This revelation prompted officers to check car rental records, which confirmed that Warrior rented the gold or champagne SUV, a Ford Explorer, from Hertz at the Kansas City International Airport, on April 21, 2005, and paid for the rental with her credit card. This information led to the fourth interview on May 5, 2005. During this fourth interview, Warrior explained she rented the SUV for Rodgers 2 days before the shooting because he wanted to take his children to Worlds of Fun in Kansas City, Missouri, on April 22, 2005. When asked what she had planned to do when Jeremy saw the credit card bill, Warrior told the officers that she was going to tell him about Rodgers. Warrior then identified Rodgers as the shooter.

After Warrior made this last recorded statement, the officers had her moved to a different hospital room. The next day, Warrior called Detective Lawson and told him that Rodgers had called her

at the new location. She was concerned that Rodgers had somehow learned of her room change.

Sometime after this, in 2005, Rodgers was arrested in connection with the attack on Warrior and Jeremy. These charges were dismissed by the State when, just before Rodgers' preliminary hearing, Warrior recanted her identification of Rodgers as the shooter. Thereafter, officers continued to investigate the case.

On February 2, 2006, Warrior gave a deposition at the district attorney's office. During the deposition Warrior, for the most part, reverted back to her first statement to officers and indicated that she could not identify the shooter. Warrior indicated her first statement about the two Hispanic attackers was accurate. Upon clarification, however, she said she had only "seen one" perpetrator. According to Warrior's deposition, the SUV at the scene was gold or champagne, not red, but she was "not for sure if it was the one I rented." When asked about her relationship with Rodgers at the time of the shooting, Warrior characterized it as a "friendship." She admitted that Rodgers had visited her in the hospital, but he simply "[a]pologized for seeing me hurt." She denied having further contact with Rodgers and denied that he had made any threats to her.

In 2008, upon Moore's confession, charges were filed against Warrior, Rodgers, and Moore. After Warrior was arrested, officers interviewed her again. She denied that either she or Rodgers was involved in the shooting. Warrior indicated to officers that at the time of her 2008 arrest, she was living with Rodgers. According to Warrior, she had previously identified Rodgers as the shooter because officers had pressured her to do so, and she was trying to help the police. Warrior claimed one Hispanic man had committed the crimes.

Similar to her 2006 deposition, Warrior basically repeated much of her first version of events when she testified at her trial. Warrior explained she did not initially disclose the affair to officers because she did not want that information to come out. She no longer claimed that there was a red SUV involved in the attack; instead, a gold or champagne SUV was involved. When asked whether the SUV at the shooting was the same one she had rented from Hertz,

Warrior said, "I believe so, I'm not for sure." She denied talking to Moore or anybody else about shooting Jeremy and claimed she did not know the identity of the shooter. Warrior also denied that there was any connection between Jeremy's murder and Warrior's acquisition of life insurance. She testified that it was Jeremy's idea to obtain life insurance after a family member had died and the family had to raise money for the burial.

A jury convicted Warrior of premeditated first-degree murder and conspiracy to commit first-degree murder. The court imposed a hard 50 life sentence for the murder conviction and a concurrent sentence of 160 months' incarceration for the conspiracy conviction. Warrior now makes a timely appeal. This court's jurisdiction is under K.S.A. 22-3601(b)(1) (appeal of murder conviction; off-grid crime; life sentence).

## SUPPRESSION OF HOSPITAL INTERVIEWS

Warrior's first argument on appeal is that the trial court erred by admitting into evidence certain statements made by Warrior to law enforcement officers who questioned her while she was a patient in the hospital. Specifically, Warrior contends the third and fourth hospital interviews conducted on May 3, 2005, and May 5, 2005, were custodial interrogations, and her statements should have been suppressed because she was not *Mirandized*. Warrior acknowledges officers had previously interviewed her at the hospital on April 26, 2005, and April 30, 2005, the first and second interviews, but she does not dispute the admissibility of her statements made during those encounters.

Warrior objected to the admission of the statements before and during the trial, arguing she was considered to be a "suspect" early in the investigation of the case and that, although officers did not arrest Warrior at the hospital, she "certainly was not able to leave" at the time of the hospital interviews because of her physical condition. Therefore, she argued, the interrogations were custodial.

After considering counsel's arguments, the testimony of both Warrior and Detective Lawson, and the transcript of Warrior's indictment proceeding held before a grand jury, the judge, at a pretrial hearing, found that the interviews were not custodial, stating:

"[T]his brings to mind a quote from a famous detective, Inspector Clouseau, who indicated, 'I suspect everyone and I suspect no one,' and I think that was probably the case here, . . . is this defendant was never a non-suspect. I guess because she was a spouse and because information that came in early, but she certainly remained possibly only a victim all the way through this investigation, I guess up through her third statement. But the key here is she was never in custody. I think clearly this was not a custodial investigation, even by her own admission. She could have told [Detective Lawson] to leave, in fact, did so and he did leave."

## Custodial Interrogations

The trial court appropriately focused on whether the interviews were custodial interrogations because law enforcement officers are not required to administer *Miranda* warnings to everyone questioned, only to those who are (1) in custody and (2) subject to interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966); *State v. Warledo*, 286 Kan. 927, 935, 190 P.3d 937 (2008). A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Miranda*, 384 U.S. at 444. A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation has reached the accusatory stage. *State v. Jacques*, 270 Kan. 173, 185-86, 14 P.3d 409 (2000).

Factors to be considered in determining if an interrogation is investigative or custodial include: (1) the time and place of the interrogation; (2) the duration of the interrogation; (3) the number of law enforcement officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the officers to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. *State v. Morton*, 286 Kan. 632, 640, 186 P.3d 785 (2008), *cert. denied* 555 U.S. 1126 (2009). "No one factor out-

weighs another, nor do the factors bear equal weight. Every case must be analyzed on its own particular facts. [Citation omitted.]" *State v. Schultz*, 289 Kan. 334, 341, 212 P.3d 150 (2009).

An appellate court reviewing a trial court's determination of whether an interrogation is custodial, makes two discrete inquiries. Under the first inquiry, the court determines the circumstances surrounding the interrogation, employing a substantial competent evidence standard of review. In determining if there is substantial competent evidence supporting the existence of the circumstances found by the trial court, an appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Edwards*, 291 Kan. 532, 545, 243 P.3d 683 (2010); *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 (2009). The second inquiry employs a de novo standard of review to determine whether, under the totality of those circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. *Schultz*, 289 Kan. at 340-41; *State v. James*, 276 Kan. 737, 751, 79 P.3d 169 (2003).

As we apply these principles to the circumstances in this case, nearly all the factors indicate the third and fourth hospital interviews conducted on May 3, 2005, and May 5, 2005, were investigatory, not custodial.

1. *Time and Place.* The investigations occurred while law enforcement officers were still tracking down information and were prompted by new information disclosed through that investigation. With regard to the location of the questioning, the interviews occurred in Warrior's hospital room, a neutral location. The neutral atmosphere is further evidenced by the fact that Warrior's family members were present during the May 3 interview. Generally, other things being equal, a person questioned in familiar, or at least neutral, surroundings does not face the same pressures as one questioned in a police-dominated atmosphere and this factor weighs against a conclusion that an interview was custodial. See 2 LaFave, Criminal Procedure § 6.6(e), pp. 738-39 (3d ed. 2007) (discussing locations of interrogations in determining whether they are custodial). Additionally, "a hospital room does not produce the aura of police authority that a police department interview room

does." *People v. Vasquez*, 393 Ill. App. 3d 185, 191, 913 N.E.2d 60 (2009).

2. *Duration of Interrogation.* The interviews were short in duration and dealt with Warrior's accounting of events and the identification of the shooter. Warrior had been told she could ask the officers to leave; in other words, she was in control of the length of the interviews.

3. *The number of law enforcement officers present.* There were two officers present in the room. We do not see this number as influencing our analysis.

4. *The conduct of the law enforcement officers and the person subject to the interrogation.* The officers did not use coercive threats or employ a hostile or accusatory tone. Instead, they used a conversational tone, asked for the truth, and offered protection for Warrior, if needed. Warrior was not arrested at the end of either of these interviews. As for Warrior's conduct during the interviews, although she had experienced a traumatic event and was prescribed pain medication, there was no evidence she suffered from any mental, intellectual, or emotional problems that would have affected her perception of whether she was free to terminate the questioning.

5. *The presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard.* Warrior contends she was in custody because she "was not at the hospital voluntarily and was paralyzed, effectively being medically restrained." While there is no dispute that Warrior's injuries prevented her from leaving her hospital room, physical incapacity resulting from forces outside the control of law enforcement does not amount to custody.

Restraint, as contemplated by *Miranda*, is the interference with a person's freedom which is imposed by law enforcement officers. Consequently, this court has held that a law enforcement interview of an accident victim at a hospital is not a custodial interrogation unless the victim's confinement is instigated by law enforcement or controlled for custodial purposes. *State v. Louis*, 240 Kan. 175, 181, 727 P.2d 483 (1986); *State v. Brunner*, 211 Kan. 596, Syl. ¶ 3, 507 P.2d 233 (1973), *disapproved in part on other grounds by State v. Murry*, 271 Kan. 223, 21 P.3d 528 (2001); see *State v.*

*Canaan*, 265 Kan. 835, 847, 964 P.2d 681 (1998) (defendant was not in custody where he was alone for significant periods of time and was not arrested at hospital; purpose of officers' presence at hospital was to determine when defendant would be released so they could later question him); see generally, *What Constitutes "Custodial Interrogation" at Hospital by Police Officer Within Rule of Miranda v. Arizona Requiring that Suspect Be Informed of His or Her Federal Constitutional Rights Before Custodial InterrogationSuspect Hospital Patient*, Annot. 30 A.L.R.6th 103, 120.

There is nothing in the record to indicate that the officers exercised any control over Warrior's hospitalization before her interviews. After the fourth interview, officers had Warrior moved to another hospital room. Warrior seemed to understand this was for her safety because she contacted Detective Lawson and told him Rodgers had called her at the new location. More significantly, the room change occurred after the final interview. Also, the officers allowed Warrior to leave the hospital once she was discharged.

Warrior argues another factor must be considered. Specifically, she contends the "repeated interviews" effectively put Warrior under police custody. According to Warrior, the "repeated intrusions gave the impression that although [Warrior] could terminate an interrogation, the police would return and the interrogation would resume." However, as the State notes, each hospital interview was prompted by new information. Between the first and second interviews, officers obtained Warrior's telephone records. Then, during the third interview Warrior revealed Rodgers was the shooter and—after calling Detective Lawson back into the room as he was leaving—that she had rented the SUV for Rodgers. Following that revelation, the officers investigated the car rental and called on Warrior for some follow-up information. In light of the fact the ongoing investigation raised new issues to be discussed with Warrior, we do not find the serial nature of the interviews to necessarily mean the interviews were custodial.

Further, it is noteworthy that at the beginning of the fourth hospital interview, the officers asked Warrior how she was feeling,

made sure she was up to talking to them, and told her this would be a short visit. The officers had demonstrated that all Warrior had to do was ask to terminate the interview. Warrior asked to terminate the second interview, and the officers did so. This demonstrates that Warrior was aware she could terminate the interviews at any time. At the beginning of the fourth interview, Warrior agreed to speak with the officers and indicated they had been very helpful in this situation. She indicated she wanted to explain she had no role in the shooting. She then volunteered information. At no point were the officers openly accusatory or threatening, and, as we have repeatedly noted, they did not arrest Warrior after these hospital interviews. Compare *Effland v. People*, 240 P.3d 868, 874-76 (Colo. 2010) (hospitalized defendant was in custody for *Miranda* purposes, even though he was informed that he was not under arrest and his mobility was limited for medical reasons; officer was posted outside hospital room; officers ignored defendant's repeated statements that he did not wish to speak with them; officers sat between defendant and the closed door; defendant was emotionally distraught; officers' questions provided details of the incident and were designed to elicit agreement from defendant); and *Louis*, 240 Kan. at 183-84 (hospitalized defendant was in custody where defendant was notified that his blood was being drawn for law enforcement purposes while three officers were present, and defendant was arrested immediately upon release from hospital), with *United States v. Robertson*, 19 F.3d 1318, 1320-21 (10th Cir.), *cert. denied* 513 U.S. 906 (1994) (defendant was not in custody where federal agent testified the FBI did not intend to take defendant into custody at time of interview, and defendant was free to check himself out of hospital), and *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (defendant, who had been making bombs in his apartment, had been injured in explosion, and had gone to hospital for treatment, was not in custody when officers went to hospital and questioned him, and thus, *Miranda* warnings were not required), and *James*, 276 Kan. at 751-52 (defendant was not in custody when officers questioned him in a hospital waiting room and at the police station regarding the deaths of two dependent adults in his care).

We conclude Warrior was neither actually restrained by law enforcement nor under the functional equivalent of custody.

6. *Whether the person is being questioned as a suspect or a witness.* Warrior also contends she was being questioned as a suspect. Detective Lawson testified that he did not begin to think of Warrior as a suspect until the time of Rodgers' 2005 preliminary hearing—well after Warrior's May 3, 2005, and May 5, 2005, interviews—when Warrior recanted her identification of Rodgers as the shooter. The trial judge apparently did not find this testimony entirely credible, as shown by the judge's finding that Warrior "certainly remained possibly only a victim all the way through this investigation, I guess *up through her third statement.*" (Emphasis added.)

Also, Warrior points out that in the time period between the second and third hospital interviews, officers talked to Warrior's sister about information indicating that Rodgers had called the sister's telephone sometime after the shooting. The officers told Warrior's sister she needed to be truthful in order to avoid possible obstruction charges. Warrior does not contend she was made aware of the officers' communications with her sister before her interviews, however. Consequently, we do not consider this as a factor in our analysis.

Nevertheless, in the time period between Warrior's second and third hospital interviews, the officers did express to Warrior their doubts about her truthfulness regarding the possible affair with Rodgers. They told Warrior that if she was afraid to relay information about Rodgers, they could provide protection from him. In encouraging Warrior to be truthful, the officers further stated that if it was later discovered Rodgers was involved in the shooting, "it would be hard to justify she wasn't involved." It was after this interaction with officers that Warrior admitted, during the third interview, that she was having an affair with Rodgers and identified him as the shooter. Warrior indicated she had not previously disclosed this information to officers because she was fearful of Rodgers. But she also called Lawson back into her room to report her rental of the SUV.

Because the officers focused on her potential culpability during this third interview, Warrior argues she was an accused. She cites *State v. Hewes*, 558 A.2d 696 (Me. 1989), to support her contention that she was in custody at the time of the May 3, 2005, and May 5, 2005, hospital interviews. Besides the fact that *Hewes* is not binding precedent, it is not helpful to our analysis. In *Hewes*, a case involving a charge of manslaughter in the shooting death of a boarding house resident, the Maine Supreme Court concluded that the evidence supported the trial court's finding that the defendant, who was interrogated at the police station, was in custody, and the defendant's statements made to officers during two interviews were suppressible in the absence of *Miranda* warnings. Hewes was driven twice to the police station in a police cruiser, was questioned by officers for 50 minutes and 45 minutes respectively, and was asked for detailed and specific information about the victim's death. The *Hewes* court mentioned the fact that the interrogating officer told the defendant he could terminate the second interview and leave at any time "does not compel a finding that Hewes was not in custody." *Hewes*, 558 A.2d at 699 n.6. Also, the court focused on the specific and lengthy questioning. These factors are also present in this case, Warrior argues.

However, the facts and circumstances in *Hewes* are too dissimilar to be of any assistance here. While Hewes was told he could terminate the interview, there was no suggestion he was free to leave, a possibility that would seem unlikely to a reasonable person who had been transported to the police station in a police car. In contrast, the officers did not exercise control over Warrior's ability to leave the hospital and never gave her any indication she was in their custody. Further, on the one occasion when she asked to terminate the interview, the officers did so.

Nevertheless, this factor gives at least some support to Warrior's position that she was in custody.

7. *Whether the person being questioned was escorted by officers to the interrogation location or arrived under his or her own power.* Warrior was taken to the hospital for treatment, not by order of law enforcement.

8. *The result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation.* As the State points out, this was an ongoing investigation, where Warrior was seriously injured, and the officers wanted to learn the truth about Warrior's relationship with Rodgers and what motive Rodgers might have had to kill Jeremy. The officers did not arrest Warrior after any of these hospital interviews.

*Conclusion.* At most, the only factor favoring Warrior's argument would be that the officers considered Warrior to be a possible suspect by the time they conducted the May 3, 2005, and May 5, 2005, the third and fourth interviews. But the fact a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings. *State v. Costa*, 228 Kan. 308, 312, 613 P.2d 1359 (1980); *State v. Bohanan*, 220 Kan. 121, 129, 551 P.2d 828 (1976); see *Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984) (mere fact that investigation has focused on suspect does not trigger need for *Miranda* warnings in noncustodial settings); *Beckwith v. United States*, 425 U.S. 341, 347-48, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976) (same); 2 LaFave, Criminal Procedure § 6.6(a) (3d ed. 2007) (discussing differences between custody and focus).

The totality of the circumstances in this case shows that the investigation had not reached the custodial or accusatory stage. See *Jacques*, 270 Kan. 173, Syl. ¶ 7; *State v. Gooden*, 22 Kan. App. 2d 271, 276, 915 P.2d 169, *rev. denied* 260 Kan. 998 (1996). Consequently, we conclude that substantial competent evidence supports the trial court's finding that Warrior was not in custody at the time of the May 3, 2005, and May 5, 2005, hospital interviews. Further, under the totality of the circumstances, a reasonable person would have felt free to terminate the interviews and disengage from these encounters.

### FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

Next, Warrior argues the trial court abused its discretion in denying her motion for new trial on the basis that the State failed to disclose exculpatory evidence which pertained to a juvenile burglary adjudication of Moore, a key prosecution witness. Warrior

contends the State violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and, consequently, Warrior's due process rights under the United States Constitution were violated.

*Procedural Posture and Trial Court Findings*

Before trial, Warrior filed a discovery request, seeking, in part, the State's production of the "criminal record[s] of all non-police and non-medical witnesses for the State" and "[a]ll evidence exculpatory to the defendant." Sometime after the jury reached its verdict, the State informed defense counsel about its discovery of Moore's 1994 juvenile adjudication for burglary, an adjudication of which the State was previously unaware. One of the arguments in Warrior's posttrial "Motion for Acquittal or in the Alternative for New Trial" claimed that because the State failed to provide information of this adjudication before or during trial, Warrior was prejudiced because she was not able to use this "conviction involving dishonesty or false statement as a means of impeaching [Moore's] credibility as a witness." The exact timing of the State's discovery of this information is not clear from the record. The State simply asserted in its response to Warrior's motion for new trial that "[t]he State disclosed this information to Defendant upon receiving a copy of Moore's Pre-Sentence Report."

At the hearing on Warrior's motion for new trial, the prosecutor explained that before trial the State had entered Moore's name into two national computer databases available to law enforcement, the National Crime Information Center (NCIC) and the Interstate Identification Index (Triple I). (NCIC is a computerized index of criminal justice information. *United States v. McKenzie*, 779 F. Supp. 2d 1242, 1243 [D.N.M. 2011]. Triple I is a criminal history database. *Dempsey v. City of Baldwin*, 143 Fed. Appx. 976, 980 n.7 [10th Cir. 2005] [unpublished opinion].) Unfortunately, Moore's juvenile adjudication, which occurred approximately 14 years earlier, did not show up on the computer search.

The trial judge made the following findings regarding this evidence:

"I think Mr. Moore was a substantial witness here, and he testified at length that he had lied to the police on several occasions. He was very forthcoming about that, as he pretty much had to be. Of course, he was as most people do when they are charged with a crime . . . not going to tell the police that he was involved in this case. . . . [A]ccording to the evidence that the Court heard and this jury heard, he was the least culpable of the three people involved in this by a long shot and he was the logical person for the State to make a deal with. They made that deal. He was cross-examined at length about the deal. I don't believe that the prior conviction from 14 years back as a juvenile was withheld by the State. I think it was in actual likelihood overlooked by the State, and I don't believe that it would have had any impact, given the other instances of him being untruthful. So I don't believe it is a basis, given the total weight of the evidence here, to grant a new trial. So the motion will be denied."

### Standard of Review

K.S.A. 2011 Supp. 22-3501(1) permits a trial court to grant a new trial to the defendant "if required in the interest of justice." Appellate courts review a trial court's ruling on a motion for mistrial for an abuse of discretion. Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, in other words, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, in other words, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, in other words, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). "In some cases, this three-part standard may narrow the broad discretion previously allowed when this court routinely applied only the no-reasonable-person-would-take-the-same-view standard." *Ward*, 292 Kan. at 550-51 (citing *State v. Ransom*, 288 Kan. 697, 715, 207 P.3d 208 [2009]) (mistrial abuse of discretion standard "does not change even if legal error prompted consideration of a mistrial"; applying standard of whether any reasonable person would take the same view).

### Brady *Violations: General Principles of Law*

In *Brady*, the United States Supreme Court held that prosecutors have a positive duty to disclose evidence favorable to the ac-

cused when "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; see *Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *accord State v. Gonzalez*, 290 Kan. 747, 766, 234 P.3d 1 (2010); *State v. Francis*, 282 Kan. 120, 150, 145 P.3d 48 (2006); see also *United States v. Bagley*, 473 U.S. 667, 678-81, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (discussing discovery, after trial, of information favorable to the accused that had been known to the prosecution but unknown to the defense); *In re Jordan*, 278 Kan. 254, 261, 91 P.3d 1168 (2004) (discussing prosecutor's duty to disclose negating and mitigating evidence under Kansas Rules of Professional Conduct [KRPC]); KRPC 3.8(d) (2011 Kan. Ct. R. Annot. 578). Further, because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement. See *Francis*, 282 Kan. at 150 (citing *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 [1995]).

Evidence that is favorable to the defendant encompasses both exculpatory and impeachment evidence. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). For *Brady* purposes, there is no distinction between these two types of evidence that are "favorable to accused"; thus, impeachment evidence is considered exculpatory. *Strickler*, 527 U.S. at 281; see *Bagley*, 473 U.S. at 676.

There are three components or essential elements of a *Brady* violation claim: (1) " 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching' [citation omitted]"; (2) " 'that evidence must have been suppressed by the State, either willfully or inadvertently' [citation omitted]"; and (3) the evidence must be material so as to establish prejudice. *Wilkins v. State*, 286 Kan. 971, 989, 190 P.3d 957 (2008); *Haddock v. State*, 282 Kan. 475, 506, 146 P.3d 187 (2006); see *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004); see also *Strickler*, 527 U.S. at 290 (prejudice encompasses the materiality requirement of *Brady*).

In the present case, the first two *Brady* elements are not at issue. It is undisputed that the evidence in question was exculpatory in the sense that it bore upon the credibility of Moore, a key witness for the prosecution. Further, it is undisputed that the State, for whatever reason, failed to timely produce the evidence of Moore's juvenile burglary adjudication. Thus, our analysis requires the consideration of only the third element, materiality.

*Reasonable Probability Materiality Test*

In their appellate briefs, both parties cite to a sliding scale materiality analysis, which this court has endorsed in past cases. See *State v. Adams*, 280 Kan. 494, 501, 124 P.3d 19 (2005); *State v. Aikens*, 261 Kan. 346, 381, 932 P.2d 408 (1997). This analysis was derived from the United States Supreme Court's materiality analysis in *United States v. Agurs*, 427 U.S. 97, 103-07, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), which varied depending upon the type of *Brady* violation, in other words, the level of intent behind the prosecutor's conduct and the specificity of the defendant's discovery request. See *Adams*, 280 Kan. at 501 ("sliding scale" applies as "the level of intent supporting the State's conduct decreases").

What the parties fail to recognize is that after *Agurs* the Supreme Court adopted a more narrow, uniform test for materiality governing all categories of *Brady* violations: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *accord Cone v. Bell*, 556 U.S. 449, 470, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009). The *Bagley* Court emphasized that this reasonable probability test for materiality is "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused" that had previously served as the lines of demarcation for applying the *Agurs* sliding scale test. *Bagley*, 473 U.S. at 682. The *Bagley* Court did not specifically overrule *Agurs*, but it clearly rejected the use of a sliding scale analysis. *Bagley*, 473 U.S. at 682; see Stacy, *The Search for the Truth in Constitutional Criminal Procedure*, 91

Colum. L. Rev. 1369, 1392-93 (1991) (noting that *Bagley* adopted the narrowest of three potential materiality standards).

Subsequently, the Supreme Court has explained that the reasonable probability test does *not* require a demonstration that disclosure of the evidence would have resulted in the defendant's acquittal. Instead, it must be shown that " 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citation omitted.]" *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S. Ct. 2188, 165 L. Ed. 2d 269 (2006).

Despite these rulings of the United States Supreme Court, which control our analysis of a due process issue brought under the United States Constitution, some Kansas cases decided after *Bagley* have continued to refer to the abandoned *Agurs* sliding scale materiality test. See, *e.g.*, *Adams*, 280 Kan. at 501; *Aikins*, 261 Kan. at 381; *State v. Carmichael*, 240 Kan. 149, 152, 727 P.2d 918 (1986). These cases applying the sliding scale materiality test have not cited an independent Kansas basis for continuing to use the test and have failed to recognize the Supreme Court's disapproval of the test. Other cases have appropriately applied the reasonable probability test. *Francis*, 282 Kan. at 151; *Haddock*, 282 Kan. at 507; *Ludlow v. State*, 37 Kan. App. 2d 676, 685, 157 P.3d 631 (2007). To reconcile these conflicting lines of cases, we clarify that the *Agurs* sliding scale test no longer applies and disapprove those cases utilizing the test.

In our past cases applying the sliding scale test, this court reviewed the trial court's application of the test under an abuse of discretion standard. *E.g.*, *Adams*, 280 Kan. at 501; *Aikens*, 261 Kan. at 381. In contrast, this court typically conducts a de novo review of materiality, at least in other contexts. *E.g.*, *State v. Inkelaar*, 293 Kan. 414, 424, 264 P.3d 81 (2011) (determining materiality of evidence under K.S.A. 60-455); *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010) (determining materiality of evidence as part of relevancy equation). Our treatment of materiality determinations in these other contexts raises the question of whether an abuse of discretion standard should be applied when reviewing a trial court's ruling regarding an alleged *Brady* violation under the

reasonable probability test. Consistent with our general treatment of materiality determinations, federal courts uniformly hold that the determination of a *Brady* violation is a legal question. Consequently, that question is reviewed de novo with deference to any factual findings. *E.g., United States v. Turner*, 674 F.3d 420, 428 (5th Cir. 2012). Some of these federal courts have explained that a de novo review of materiality does not conflict with the application of the abuse of discretion standard to the question of whether the trial court erred in ruling on a request for new trial. As one federal court explained:

"The district court's determination as to the existence of a *Brady* violation is reviewed de novo, *United States v. Miller*, 161 F.3d 977, 987 (6th Cir. 1998), but the district court's denial of [the defendant's] motion for new trial is reviewed under an abuse of discretion standard. *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005). ' "A district court abuses its discretion when it applies an incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." ' [Citation omitted.]" *United States v. Holder*, 657 F.3d 322, 328 (6th Cir. 2011).

See also, *e.g., Turner*, 674 F.3d at 428 ("We review the denial of a motion for a new trial for abuse of discretion but consider alleged *Brady* violations de novo. This de novo review 'must proceed with deference to the factual findings underlying the district court's decision.' "); *United States v. Pelisamen*, 641 F.3d 399, 408 (9th Cir. 2011) ("While the standard of review for a trial court's denial for a motion for a new trial is generally abuse of discretion, review is *de novo* when the asserted basis for a new trial is a *Brady* violation."); *United States v. Wilson*, 624 F.3d 640, 661 n.24 (4th Cir. 2010) ("[M]otions for a new trial based on an alleged *Brady* violation are reviewed for abuse of discretion. It is an abuse of discretion for the district court to commit a legal error—such as improperly determining whether there was a *Brady* violation—and that underlying legal determination is reviewed de novo."); *United States v. Graham*, 484 F.3d 413, 416-17 (6th Cir. 2007), *cert. denied* 552 U.S. 1280 (2008) (The appellate court "reviews denial of a motion for a new trial based on *Brady* violations under an abuse of discretion standard," but reviews "the district court's determination as to the existence of a *Brady* violation . . . de novo."); *United*

*States v. Pelullo,* 399 F.3d 197, 202 (3d Cir. 2005), *cert. denied* 546 U.S. 1137 (2006) (An appellate court ordinarily reviews "a district court's ruling on a motion for a new trial on the basis of newly discovered evidence for abuse of discretion." But, where "the motion for a new trial is based on a *Brady* claim, which presents questions of law as well as questions of fact," the appellate court " 'will conduct a de novo review of the district court's conclusions of law as well as a "clearly erroneous" review of any findings of fact.' ").

These decisions are consistent with one part of our three-part abuse of discretion standard, specifically, the one prong under which judicial discretion is abused if judicial action is based on an error of law. *Ward,* 292 Kan. 541, Syl. ¶ 3. Consequently, we hold that a trial court's determination as to the existence of a *Brady* violation is reviewed de novo with deference to a trial court's findings of fact, but the trial court's denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard.

As a final note of clarification, we address the role of the harmless error standard in a *Brady* analysis because the State has cited to this standard, although it has done so in the context of the sliding scale test. The United States Supreme Court has explained that "once a reviewing court applying *Bagley* has found constitutional error, there is no need for further harmless-error review." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Although *Kyles* was a habeas action—in other words, a collateral attack—the federal courts and commentators have recognized there is no need to conduct a harmless error analysis if a *Brady* violation is found in a direct appeal. *E.g., United States v. Kohring,* 637 F.3d 895, 902 (9th Cir. 2011); Kahn, *Presumed Guilty Until Proven Innocent: The Burden of Proof in Wrongful Conviction Claims under State Compensation Statutes,* 44 U. Mich. J.L. Reform 123, 160 n.164 (Fall 2010) (noting that *Brady* violations are exempt from harmless error analysis); *see United States v. Snipes,* 751 F. Supp. 2d 1279, 1288 n.9 (M.D. Fla. 2010) ("The 'reasonable probability' standard is substantially the same as the classic 'harmless error' standard.").

With these principles in mind we turn to application of the reasonable probability test to the facts of this case.

*Application of Reasonable Probability Test*

Again, in applying the reasonable probability test we must make a de novo review, giving deference to the trial court's factual findings, of whether there is a reasonable probability that, had Moore's juvenile burglary adjudication been disclosed to the defense before the end of Warrior's trial, the result of the proceeding would have been different. In other words, does the evidence put the whole case in such a different light as to undermine confidence in the verdict? Although not stating the test in these terms, the trial judge answered the question by stating, "I don't believe that it would have had any impact."

Our de novo review leads us to the same conclusion. Certainly, as Warrior points out in her appellate brief, Moore was a key witness for the prosecution in that Moore provided "first-hand knowledge" of Warrior's involvement in Jeremy's murder, detailing the plan and the execution of the plan. Yet, as the State observed, the credibility of Moore on the question of dishonesty was thoroughly attacked at trial. During defense counsel's extensive cross-examination of Moore, Moore admitted to initially naming a person other than Rodgers as the shooter and identifying that person in a photo lineup, changing his versions of events, repeatedly lying to officers, and "making up stuff." Moore also admitted to testifying in exchange for a plea agreement with the State. He was significantly impeached on his motive for testifying and his capacity for truthfulness—the very factors that, according to Warrior, make this juvenile adjudication evidence prejudicial. See *State v. Armstrong*, 240 Kan. 446, 452, 731 P.2d 249, *cert. denied* 482 U.S. 929 (1987) (impeachment evidence not material where witness had been impeached at trial with his prior inconsistent statements and with alleged "concessions" made to his son); see also, *e.g., Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006), *cert. denied* 549 U.S. 1125 (2007) (indicating that if suppressed evidence is merely cumulative, then the failure to disclose is not a violation); *United States v. Trujillo*, 136 F.3d 1388, 1394 (10th Cir.), *cert. denied* 525 U.S. 833

(1998) (stating undisclosed impeachment evidence is immaterial where it was cumulative of evidence of bias or partiality already presented "and thus would have provided only marginal additional support for [the] defense"); *Spence v. Johnson,* 80 F.3d 989, 995 (5th Cir.), *cert. denied* 519 U.S. 1012 (1996) (stating information is not material under *Brady* if it is merely cumulative of other evidence already before the factfinder).

Moreover, the undisclosed adjudication was for an offense committed by Moore as a juvenile and 14 years before the trial. Given that, evidence of the adjudication added little to the impeachment evidence presented to the jury.

Therefore, it cannot be concluded that there was a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The confidence of the jury's verdict has not been compromised.

## Hearsay Regarding Marital Strife

Next, Warrior argues the trial court erred in allowing the State to present hearsay testimony regarding statements made by Jeremy indicating his belief that his marriage was in trouble. This testimony came from two witnesses—Jeremy's uncle and a friend who was also a coworker of Jeremy's. Jeremy's uncle testified that Jeremy was considering a divorce. The uncle described a telephone conversation several weeks before Jeremy's death in which Jeremy complained about Warrior being out all night. The uncle asked, " 'Well, do you think she is messing around?' " Jeremy did not give him an answer but said he was going to wait a couple of weeks to make a decision. About a week later, Jeremy reported things had improved. But Jeremy's uncle testified, "[T]he night before he got shot, he had called me and said that she had been gone all of that night, most of that night."

The other witness, Jeremy's friend and coworker, testified Jeremy had confided about trouble in his marriage and suspected Warrior was not working as many hours as she claimed to be. The day before Jeremy was killed, the friend suggested Jeremy check Warrior's pay stub to see if her pay correlated with her claims of working late and then he should confront her.

During the testimony of both witnesses, Warrior objected on the basis of "hearsay." Although the trial court found that the statements did not constitute hearsay because they were not offered for the truth of the matter asserted, it also found the statements showed Jeremy's "impressions" and "feelings" at the time he made them, implying they fit into a hearsay exception. In making these rather ambiguous findings, the trial court did not explicitly reference any statutory exceptions to hearsay. Although the State notes that the trial court found the statements were not offered for the truth of the matter asserted, it did nothing more to advance this argument on appeal. Even if it had, the evidence of Jeremy's growing suspicions and discussions of divorce—indeed, the truth that those existed—impacted the State's evidence of motive. All but conceding this, the State offers suggestions for hearsay exceptions under which the trial court's rulings might fall.

Despite the State's suggestions, it is impossible from the record to determine which, if any, exceptions the trial court might have contemplated as a basis for admitting the evidence. We need not attempt to divine the trial court's rationale, however, because even if the evidence was erroneously admitted, the admission was harmless.

In making that determination in the context of a violation of evidentiary limitations proscribed by the Kansas Code of Evidence, as opposed to a violation of a constitutional right, we apply the statutory harmless error standard of K.S.A. 60-261 and K.S.A. 60-2105 to determine if there is a reasonable probability the error affected the outcome of the trial in light of the record as a whole. The State, as the party benefitting from the introduction of the evidence, has the burden of persuasion. *State v. McCullough*, 293 Kan. 970, 270 P.3d 1142 (2012) (citing *Ward*, 292 Kan. at 568-69).

Here, the State has met that burden, primarily because the evidence from these two witnesses regarding Jeremy's suspicions added little to the considerable evidence from Moore and from Warrior herself about Warrior's and Rodgers' relationship. Moore testified that Rodgers and Warrior were having an affair. Warrior admitted to an extramarital affair and explained the when, where, and how aspects of the two spending time together on an almost

daily basis. The jury heard the recording of Warrior's statements in her third hospital interview, in which she said she was falling in love with Rodgers and that her behavior caused problems with Jeremy because she was staying out late at night. Jeremy did not know about the affair, but he had his suspicions, she stated. These statements by Warrior are essentially the same as the hearsay statements to which she objects. The hearsay evidence added little or nothing to the issue.

Hence, we find the admission of the evidence, assuming it was error, to have been harmless.

## DEADLOCKED JURY INSTRUCTION

Next, Warrior challenges language found in an instruction given to the jury before deliberations that stated "[a]nother trial would be a burden on both sides." This instruction mirrored a prior version of PIK Crim. 3d 68.12 (2005 Supp.), commonly known as the "deadlocked jury" instruction or *Allen*-type instruction. See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). Warrior admits she did not object to the instruction and that the clearly erroneous standard of review applies as a result. See K.S.A. 22-3414(3). Nevertheless, she argues the trial court clearly erred in giving the instruction in light of our disapproval of this language in *State v. Salts*, 288 Kan. 263, 265-66, 200 P.3d 464 (2009).

Subsequent to *Salts*, this court has consistently confirmed its holding, which means that the instruction in this case was erroneous. But in numerous cases applying this holding, we have concluded that giving the instruction with the challenged language was not clear error. See, *e.g.*, *State v. Burnett*, 293 Kan. 840, 270 P.3d 1115 (2012); *State v. Washington*, 293 Kan. 732, 740, 268 P.3d 475 (2012) (listing cases). Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *Salts*, 288 Kan. at 265-66.

Warrior attempts to distinguish the long list of cases that hold the instructional error was not clearly erroneous by arguing the evidence against her "was largely circumstantial and not overwhelming." This argument is not persuasive. There was ample ev-

idence, both circumstantial and direct, of Warrior's guilt. There was evidence Warrior was having an affair with Rodgers, she plotted her husband's death with Rodgers and Moore, she offered to pay Moore out of the proceeds from her husband's life insurance policies, she rented the SUV used by Rodgers and Moore in the attack, she led Rodgers and Moore to her house on that fateful morning, she had at least one telephone conversation with Rodgers just moments before the shooting, and she signaled to Rodgers as she drove down the street. In addition to Moore's testimony, independent evidence corroborated many of these details.

Moreover, Warrior's argument does not suggest why the misleading nature of the instruction might have made a difference in the jury's deliberations. Nothing in the record demonstrates the jury was near deadlock, deadlocked, pressured to reach a verdict, or concerned about the implications of another trial.

Consequently, we conclude there was not a real possibility that the jury would have rendered a different verdict had the error not occurred. The trial court's giving the *Allen*-type jury instruction was not clearly erroneous.

## CONSTITUTIONALITY OF K.S.A. 21-4635

Next, Warrior contends that because a jury does not determine the facts that increase the penalty beyond a reasonable doubt, Kansas' hard 50 sentencing scheme under K.S.A. 21-4635 is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999).

This court has previously rejected the same challenge in numerous cases. See, *e.g., State v. McCaslin*, 291 Kan. 697, 729-30, 245 P.3d 1030 (2011); *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 11, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010); *State v. Martinez*, 288 Kan. 443, 451, 204 P.3d 601 (2009); *State v. Conley*, 287 Kan. 696, 700-01, 197 P.3d 837 (2008); *State v. Warledo*, 286 Kan. 927, 954, 190 P.3d 937 (2008); *State v. Reid*, 286 Kan. 494, Syl. ¶ 23, 186 P.3d 713 (2008). Warrior does not present any grounds for reconsidering our prior holdings, and based on those holdings, her argument fails.

## CUMULATIVE ERROR

Finally, Warrior argues that cumulative error requires reversal of her convictions and remand for a new trial. She contends that even if the errors alleged on appeal do not individually require this court to reverse her convictions, the cumulative impact of the alleged errors denied her a fair trial. As discussed, the trial court erred in giving an erroneous deadlocked jury instruction and we have assumed the court erred in admitting the hearsay evidence regarding Jeremy's statements about his deteriorating marriage. Two other points of error must also be discussed.

The first of these is one that Warrior points to in her brief. She states in passing that during trial testimony a witness expressed his personal opinion that Warrior was involved in the shooting. Defense counsel objected to this statement, and the trial court ordered the witness' response to be stricken. Warrior fails to cite any authority or make any argument to support the contention that this incident, which was immediately dealt with by the trial court, contributes to "cumulative error." Moreover, we see no basis to believe the jury did not follow the court's instruction to disregard the evidence. Consequently, any harm caused by this error is extremely minimal, if not nonexistent. But the error did occur, even if immediately remedied.

The second point relates to the alleged *Brady* violation. The State admits it failed to provide exculpatory evidence that was within the State's control. Nevertheless, we have determined there was not a *Brady* violation because the evidence was not material. The role of a failure to disclose evidence that is not a *Brady* violation in a cumulative error analysis seems to be a matter of some debate with federal courts adopting different approaches. For example, one panel of the Ninth Circuit Court of Appeals recently held that the failure to provide exculpatory evidence that was not material does not factor into a cumulative error analysis. See *United States v. Wilkes*, 662 F.3d 524, 543 (9th Cir. 2011). On the other hand, a different Ninth Circuit panel combined the materiality analysis of the *Brady* violation and a prosecutorial misconduct analysis, although it noted that "[i]t is unclear whether we should em-

ploy *Brady*'s prejudice standard to evaluate the cumulative effect of the prosecutorial misconduct and the non-disclosure." *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010). Because of this uncertainty, we reserve the determination of the question for another day when the parties in a case have argued the question. For our purposes, we will give Warrior the benefit of considering the failure to disclose in our cumulative error analysis. Nevertheless, because we have held that there was not a *Brady* violation, we will not consider the State's failure to disclose the information as a constitutional error.

Hence, we consider the cumulative effect of four nonconstitutional errors—the *Salts* error, the assumed hearsay error, the witness' statement regarding his belief in Warrior's guilt, and the failure to disclose Moore's 14-year-old juvenile adjudication.

"In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless. [Citation omitted.] In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial?" *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

Where, as here, the only errors we have found or assumed are not constitutional in nature, we examine whether there is a reasonable probability the aggregated errors would have affected the outcome of the trial. See *State v. Ward*, 292 Kan. 541, 578, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (February 21, 2012). In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the trial court dealt with the errors as they arose, including the efficacy, or lack of efficacy, of any remedial efforts; the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. See *Ward*, 292 Kan. at 578.

As we have discussed, none of these errors or presumed errors were independently significant. The hearsay was cumulative of statements made by Warrior herself, the court immediately told the jury to disregard the witness' opinion regarding Warrior's guilt,

Moore's juvenile adjudication was cumulative, and there is no reason to believe the *Salts* error had any impact. Further, these errors were not related. Finally, the evidence against Warrior, while largely circumstantial or based on a codefendant who had entered a plea, was strong. Although Warrior's statements were inconsistent, in some of her interviews she implicated Rodgers as the shooter. And the telephone records show her contact with Rodgers just before the murder thereby providing circumstantial evidence implicating her. Furthermore, a neighbor identified the vehicle Warrior had rented as the vehicle at the scene, and another testified to seeing her lights off and then onthe prearranged signal, according to Moore. Moore, whose statements and testimony must be viewed in the light of our knowledge that he had a plea agreement with the State, provided details that were consistent with the telephone records, the neighbor's accounts of what they saw, the pathologist's opinion, and Warrior's own statements.

In light of the record as a whole, we conclude there is not a reasonable probability the combined errors affected the outcome of the trial.

Affirmed.