No. 125,137

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ADREAN MARQUIS NEWSON,
*Appellant*.

SYLLABUS BY THE COURT

1.

To determine whether the State has committed a *Brady* violation, *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), a court must evaluate three factors: (1) whether the disputed evidence was favorable to the accused because it was exculpatory or impeaching; (2) whether the disputed evidence was suppressed by the State, either willfully or inadvertently; and (3) whether the evidence was material, which establishes prejudice. To be material, the accused must show that there is a reasonable probability that but for the State's failure to disclose the disputed evidence to the defense, the result of the proceeding would have been different.

2.

A prosecutor's failure to disclose exculpatory evidence constitutes a *Brady* violation whether the prosecutor intentionally or mistakenly failed to disclose the evidence.

1

3.

Because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement.

4.

Delayed rather than absent disclosure of exculpatory information may or may not qualify as a *Brady* violation, depending on whether the defendant can establish prejudice due to his or her inability to use the *Brady* material effectively at trial. If the defendant has sufficient time to effectively use evidence disclosed immediately before trial or during trial, the belatedly disclosed evidence does not qualify as *Brady* material. When the State delays disclosure of favorable evidence, the defendant must establish that the delayed disclosure of the discovery prejudiced his or her ability to present his or her defense.

5.

Once a reviewing court has applied the reasonable probability test to determine if there is a *Brady* violation, there is no need for further harmless error review. There is no need to consider whether the *Brady* violation was harmless because the test whether the disputed evidence was material encompasses the constitutional harmlessness error test. Thus, if the State has failed to disclose material evidence, the accused is entitled to a new trial.

6.

When a defendant argues prosecutorial error on appeal, this court considers the defendant's argument in two steps. First, this court considers whether the prosecutor's conduct fell outside the wide latitude that prosecutors have when presenting the State's case. Second, if the defendant establishes that the prosecutor erred by engaging in conduct outside this wide latitude, then this court must consider whether the error was

harmless under the constitutional harmlessness error test. Under the constitutional harmlessness error test, an error is harmless if the State can establish that the prosecutor's error did not affect the outcome of the defendant's trial in light of the entire record.

7.

The Kansas Supreme Court has held that a prosecutor must be careful when using phrases like "we know," "we submit," "I know," and "I submit" during closing arguments to the jury. Although a prosecutor may use phrases like "we know" and "I submit" when the prosecutor is speaking about uncontroverted evidence, a prosecutor cannot use these phrases to give the prosecutor's personal opinion. A prosecutor also errs whenever the prosecutor makes an argument that draws inferences for the jury about controverted evidence using such phrases.

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Oral argument held October 16, 2024. Opinion filed February 7, 2025. Reversed and remanded.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Kayla Roehler*, deputy district attorney, *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and HILL, JJ.

GREEN, J.:  Under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), prosecutors must disclose evidence that is favorable to the defendant when the evidence is material either to the defendant's guilt or punishment. A prosecutor's failure to disclose exculpatory evidence constitutes a *Brady* violation whether the prosecutor intentionally or mistakenly failed to disclose the evidence. 373 U.S. at 87. Additionally, "'[b]ecause law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence

3

that is not known to the prosecutor but is known to law enforcement.'" *State v. Hirsh*, 310 Kan. 321, 334, 446 P.3d 472 (2019) (quoting *State v. Warrior*, 294 Kan. 484, Syl. ¶ 8, 277 P.3d 1111 [2012]).

On appeal, Adrean Marquis Newson's primary argument is that the district court erred when it denied his mid-trial motion to dismiss and later a new trial motion; in both, he argued that the State violated *Brady*. Next, Newson contends that the prosecutor committed reversible error during closing arguments by making comments about what she and the State "knew" and "submitted" was undisputed evidence. According to Newson, the prosecutor's comments were erroneous because the evidence the prosecutor was discussing was actually disputed evidence. Last, Newson alternatively argues that cumulative error requires reversal of his rape conviction. We reverse and remand for a new trial.

BACKGROUND

S.C. (referred to herein by the pseudonym John) was from the Kansas City metropolitan area. Unfortunately, John's mother had cancer, and he started acting out, and he was sent to a group home in Omaha, Nebraska, called Boys Town. While there, his mom passed away.

John remained in the group home for about a year. Afterwards, he was moved to a traditional foster home in Omaha. But John repeatedly ran away from any foster home he was placed in.

In late March 2019, John had been absent from his current foster home for about three months. On March 29, 2019, John's acquaintance, Newson, agreed to drive John and his close friend, D.B., from Omaha to Kansas City, Kansas, because John wanted to

4

visit family and friends. As of March 29, 2019, John was 16 years old, D.B. was 19 years old, and Newson was 27 years old.

Shortly after arriving in Kansas City, John, D.B., and Newson went to a Walgreens store in Shawnee. While John was in Walgreens, he posted a public video on his Facebook page saying that he was "in town." After John posted this video, his former classmate, O.Y. (referred to herein by the pseudonym Jane), decided to meet John at the Walgreens store. Jane was 16 years old.

Ultimately, around 1 p.m. on March 29, 2019, John and Jane spent about 20 minutes together while at Walgreens. In addition to catching up, John and Jane made plans for that evening. Although Jane never spoke to D.B. or Newson while at Walgreens, she knew that D.B. and Newson traveled with John to Kansas City. And Jane learned that the group had rented a hotel room in Bonner Springs, Kansas, for that evening. In the end, Jane agreed to go to the hotel later that evening.

Then, Jane invited her two teenage friends, R.D. and T.E., to come with her to the hotel. So, around dusk, Jane, R.D., T.E., John, D.B., and Newson met and then drove to the hotel. On the way to the hotel, Jane rode in Newson's car along with John and D.B. Meanwhile, Jane's friends were driving behind Newson in a different car.

Once inside the hotel room, the group was talking, laughing, and listening to music. While doing this, some people smoked marijuana. This included John and Jane. Around 1 a.m. on March 30, 2019, Newson drove Jane and John to a 7-Eleven store and a liquor store. D.B., R.D., and T.E. remained at the hotel. Because Newson was the only person who could legally buy alcohol, Newson purchased the alcohol. He entered the liquor store alone, returning to the car with a fifth of New Amsterdam, which is vodka. Then, Newson drove John and Jane back to the hotel.

Upon returning to the hotel room, some people started drinking the vodka. This included Jane and John.

Eventually, R.D. and T.E. left the gathering. There was a discussion among Jane, R.D., and T.E. about Jane leaving and going home with them. Although R.D. and T.E. left, Jane stayed. Around this same time, Jane took a walk alone with John.

The hotel room had two queen size beds and a bathroom, which was located just inside the front door on the left side of the room. When John and Jane returned to the hotel room from their walk, Jane laid on the bed closest to the bathroom and hotel door. Then, John laid behind Jane. As John and Jane laid on this bed, Newson laid on the other bed. D.B. was lying on the floor by the bathroom wall. It seems that he had passed out.

Shortly after John laid behind Jane, he kissed her with enough force that he left hickies on her neck. Somehow, John and Jane became naked. Then, while remaining on the bed, John shifted to Jane's front side and put his penis inside her mouth. John later testified that Jane was "giving [him] oral." As John continued to put his penis inside Jane's mouth, Newson moved from the other bed, maneuvered his body behind Jane, and put his penis inside her vagina. Then, Newson had vaginal intercourse with Jane. When John and Newson finished their sex acts, Jane went to the bathroom.

Once in the bathroom, Jane immediately noticed that she had "hickies all over [her] neck" and her right breast. Jane texted her boyfriend's brother for advice. He told her to call the police. Jane took a shower. She got dressed. Then, after exiting the bathroom, Jane asked to be driven to R.D.'s house. As a result, sometime after 3 a.m. on March 30, 2019, Newson drove and then dropped Jane off at R.D.'s house. John was a passenger during this trip.

Although Jane told R.D.'s mother that she had been raped, R.D.'s mother told Jane that she needed to address the matter with her father. Later that morning, when Jane reached her father by cellphone, her father picked her up and drove her directly to the Bonner Springs Police Department (BSPD). On the way to the BSPD, Jane's father told her that she "was just trying to hide cheating" on her boyfriend by alleging that she had been raped.

At the BSPD station, Jane reported that John sodomized her and that Newson raped her. She told the police that she was very intoxicated when the nonconsensual sex acts occurred. She also told the police that to keep her mouth open as he sodomized her, John choked her, forcing her jaw open.

Because Jane alleged that John and Newson committed sex crimes against her, Jane was taken to a hospital. She was examined by a nurse who collected Jane's DNA and swabbed different parts of her body to determine whether someone else's DNA was on her body. Later, BSPD obtained John's DNA and Newson's DNA too.

When a forensic biologist with the Kansas Bureau of Investigation (KBI) tested John's DNA as compared to Jane's swabs, it showed that John's DNA was on Jane's neck, left breast, and right breast. The testing of Newson's DNA as compared to Jane's swabs showed that Newson's DNA was on Jane's left breast swab, vaginal swabs, and anal swabs.

Based on Jane's allegations, the State charged Newson with five counts. First, it charged Newson with raping Jane by force or fear, or alternatively, raping Jane while she was unconscious or physically powerless. Both alternatives were severity level 1 person felonies contrary to K.S.A. 21-5503(a)(1)(A) and (a)(1)(B), respectively. Second, it charged Newson with the aggravated criminal sodomy of Jane by force or fear, or alternatively, the aggravated criminal sodomy of Jane while she was unconscious or

7

physically powerless. Both alternatives were severity level 1 person felonies contrary to K.S.A. 21-5504(b)(3)(A) and (b)(3)(B), respectively. Third, the State charged Newson with the aggravated sexual battery of Jane based on his unlawful touching of Jane for his own sexual desires by force or fear, or alternatively, the aggravated sexual battery of Jane based on his unlawful touching of Jane for his own sexual desires while she was unconscious or physically powerless. Both alternatives were severity level 5 person felonies contrary to K.S.A. 21-5505(b)(1) and (b)(2), respectively. Fourth, the State charged Newson with contributing to a child's misconduct by buying minors alcohol, which was a Class A nonperson misdemeanor. Fifth, the State charged Newson with possessing marijuana, which was a Class B nonperson misdemeanor.

As for John, the State charged him with rape, aggravated criminal sodomy, aggravated sexual battery, marijuana possession, and minor in possession of alcohol. But in February 2020, John entered a plea agreement with the State. Under this agreement, John promised to testify on the State's behalf at Newson's future jury trial. In exchange for John's testimony, the State amended his charges to a single count of attempted aggravated criminal sodomy, *which John pleaded no contest to as a juvenile*. So, John served whatever sentence the juvenile court imposed on him in juvenile prison. In turn, by entering the plea agreement with the State, John avoided being prosecuted as an adult and avoided serving his sentence in adult prison.

Newson's five-day jury trial occurred in January 2022. At the beginning of his trial, Newson announced that he wanted to plead guilty to contributing to a child's misconduct and possessing marijuana. As a result, Newson pleaded guilty to those crimes. After Newson pleaded guilty, the district court deferred sentencing Newson for the two misdemeanor convictions until after his jury trial on the State's remaining felony charges.

8

As for the State's remaining felony charges against Newson, both the State's case against Newson and Newson's defense against the State's charges hinged on Jane's and John's credibility. The State argued that even if Jane's memory was not perfect because she was intoxicated, Jane's initial report to the BSPD was largely what happened the evening of March 29, 2019, and the morning of March 30, 2019. It argued that the evidence established that Jane never consented to any sex acts with John or Newson. Newson argued that he and Jane had consensual sex.

Although John testified on the State's behalf, he seemed to do so reluctantly. During his cross-examination, he testified about the terms of his plea agreement. He explained that he never pleaded guilty to any sex crime, rather he pleaded no contest to attempted aggravated sodomy as a juvenile. He testified that after entering his plea agreement with the State, he wrote a letter to Newson stating that they both engaged in consensual sex acts with Jane. During John's direct examination, he testified that he lied when he told BSPD officers that Jane was "willing for it." But when asked by Newson's defense counsel during recross-examination whether his plea agreement required him to testify that Jane "was not willing for it," John confirmed that his plea agreement required him to testify that Jane never consented to any sexual acts. So, although the State called John on its behalf, John implied that he believed he had consensual sex with Jane. He further suggested that he pleaded no contest to receive an easier sentence.

Relying on this evidence, Newson sought to boost John's credibility with the jury about his relationship with Jane and about what occurred in the hotel room. At the same time, Newson sought to impeach Jane's credibility with the jury generally and more specifically, on the following issues: (1) her characterization of her relationship with John; (2) her explanation of her marijuana and alcohol use; and (3) her memories from the hotel room. Newson argued that Jane was afraid of what her boyfriend and her father would do when they saw the hickies all over her neck. He argued that to avoid her boyfriend's and father's disapproval, she told the BSPD that he raped her although he had

consensual vaginal intercourse with Jane. Newson's defense was that John's explanation about what happened on March 29, 2021, and March 30, 2021, was the truth while Jane was lying. He told the jury that Jane was "not the innocent, timid, small little victim that she wanted" the jury to believe.

While testifying on the State's behalf, John told the jury that he and Jane dated in middle school. He told the jury that Jane brought her own blunt to the hotel. He claimed that Jane flirted with him before the contested sex acts, which included when she French kissed him as they took a private walk together sometime during the early morning hours of March 30, 2019. John testified that he considered both himself and Jane tipsy. He further testified that at some point, Jane was talking to him about why her "boyfriend [was] not good to her."

As for the contested sex acts, John testified that when he and Jane returned from their walk, Jane started performing oral sex on him voluntarily. John told the jury that he did not see Jane motion Newson over to have vaginal intercourse with her. He testified that before their arrest, he and Newson discussed what to tell the police if Jane contacted law enforcement. John testified that he and Newson had this conversation (1) because they realized that Jane was upset about the obvious hickies on her neck and (2) because when she was in the bathroom after the contested sex acts, Jane told John that she believed that he was her boyfriend. John explained that around the same time that Jane said this to him in the bathroom, she also asked him how she was "supposed to cover [the hickies] up."

Nevertheless, John recognized that he had his eyes closed when Jane was performing oral sex on him. Thus, he admitted that it was possible that Jane motioned Newson over to have sex. John testified that Jane did not do anything different when Newson started having vaginal sex with her; as in, she continued to perform oral sex on him once Newson started having vaginal sex with her. John testified that Jane was awake

the entire time the sex acts occurred. Additionally, John affirmed defense counsel's question that as far as he knew, Jane was "aware of what was going on."

On the other hand, Jane's testimony directly contradicted most of John's testimony. Jane testified that she and John never dated in middle school. Rather, they were friends who just held hands. She testified that she did not bring any marijuana to the hotel. She told the jury that she does not have a high tolerance for alcohol or marijuana. For this reason, she explained that during the incident, she probably had four or five shots of vodka and "[t]wo puffs" of marijuana. She explained that after consuming the vodka and smoking the marijuana, her memory was fuzzy. Jane could not remember specific details of her walk with John, like French kissing him or telling him that her boyfriend was not good to her. Still, she testified that she remembered staggering and swaying to the bed after taking a walk with John.

Jane testified that once back in the hotel, she started performing oral sex because she believed that her boyfriend wanted oral sex. All the same, she also testified that she tried to move this person away from her. But this person, who she eventually identified as John by his voice, forced her jaw open so he could put his penis in her mouth. Jane testified that while this was happening, Newson put his penis inside her vagina without her consent. Jane concluded her testimony by alleging that she was too intoxicated to consent to having sex with anyone.

After the State rested its case against Newson, Newson made two motions. In his first motion, Newson moved for a directed verdict on the State's aggravated criminal sodomy and aggravated sexual battery charges against him. Although the district court determined that there was enough evidence to support the State's aggravated criminal sodomy charge, the district court granted Newson's directed verdict motion on the State's aggravated sexual battery charge.

11

In his second motion, Newson discussed his ongoing problems obtaining discovery from the State. Highly summarized, based on evidence that defense counsel learned through John's defense attorney and evidence presented by the State on the second day of evidence, defense counsel believed that she did not have all of the discovery from the BSPD involving its investigation of Jane's rape allegation against Newson. So, on the evening of the second day of trial, she went to the BSPD to determine if Newson did not have all discovery for his case. At the BSPD office, with the help of Major Christopher Nicholson, defense counsel found hundreds of photographs taken by BSPD officers, hours of film recorded by BSPD officers on their Axon body camera equipment, and hours of surveillance footage from the hotel and convenience store that Jane and John went to on March 29, 2019.

At Newson's trial the next day, defense counsel tried to summarize what she had learned so far from the evidence that the BSPD disclosed to her the evening before. In particular, she stressed that there were 91 photographs of John's cellphone, which each depicted text messages from John and Jane starting on March 16, 2019, and ending on March 29, 2019. She explained that the text messages contained excellent impeachment material that she "would have loved to have when [Jane] was testifying." She argued that the evidence she found the night before was exculpatory and constituted *Brady* material. The prosecutor responded that the district court should deny Newson's motion because now that Newson had the evidence, he could present the evidence to the jury in his own defense. Also, the prosecutor argued that much of the new evidence merely corroborated evidence already admitted at trial. The district court agreed and denied Newson's motion to dismiss.

At the conclusion of Newson's trial, the jury found Newson guilty of raping Jane "when the victim did not consent and under circumstances when she was overcome by force or fear." But the jury acquitted Newson of committing aggravated criminal sodomy.

12

Before his sentencing, Newson moved for a new trial based on the State's delayed disclosure of the evidence related to Jane's sex-crime allegations against him. He argued that the delayed disclosure violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, his right to cross-examine adversarial witnesses under the Confrontation Clause of the Sixth Amendment to the United States Constitution, and his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution. But at his sentencing hearing, the district court denied Newson's new trial motion. Essentially, the district court ruled that none of Newson's arguments supported that the jury would have acquitted him had he had the disputed discovery before trial. It further determined that Newson was able to mitigate the harm caused by the delayed disclosure of evidence because he was able to admit some of that evidence through the testimony of BSPD officers during his defense. Of note, at this hearing, defense counsel admitted a flash drive, which she labeled "Exhibit J," containing all the material that Major Nicholson of the BSPD gave her the evening after the second day of evidence at Newson's jury trial.

After denying Newson's motion for new trial, the district court sentenced Newson to 234 months' imprisonment followed by lifetime postrelease supervision for his rape conviction. The district court ran Newson's jail sentences for his contributing to a child's misconduct and marijuana possession convictions concurrently.

Newson timely appeals.

ANALYSIS

I. *Did the State violate* Brady v. Maryland*? And if so, should this court reverse Newson's rape conviction based on the State's* Brady *violation?*

Our Supreme Court has explained that this court exercises unlimited review when considering a district court's ruling regarding the existence of a *Brady* violation but must

13

defer to the district court's fact-findings about the violation. *Hirsh*, 310 Kan. at 333. As for the district court's denial of a defendant's motion for a new trial, this court reviews the district court's decision for an abuse of discretion. 310 Kan. at 333. A district court abuses its discretion if its ruling is founded on an error of law, an error of fact, or some other unreasonable decision. 310 Kan. at 334.

As explained at the beginning of this opinion, a prosecutor's failure to disclose exculpatory evidence constitutes a *Brady* violation whether the prosecutor intentionally or mistakenly failed to disclose the evidence. *Hirsh*, 310 Kan. at 334. Likewise, "'[b]ecause law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement.'" *Hirsh*, 310 Kan. at 334. Instead, to determine whether the State has committed a *Brady* violation, a court must evaluate three factors: (1) whether the disputed evidence was favorable to the accused because it was exculpatory or impeaching; (2) whether the disputed evidence was suppressed by the State, either willfully or inadvertently; and (3) whether the evidence was material, which establishes prejudice. *Hirsh*, 310 Kan. at 334. To be material, the accused must show that there is a reasonable probability that but for the State's failure to disclose the disputed evidence to the defense, the result of the proceeding would have been different. 310 Kan. at 334. Put another way, the disputed evidence is material if there is a reasonable probability that it undermines the confidence in the jury's decision. 310 Kan. at 334.

Yet, if the defense learns that the undisclosed material is important to determining whether a *Brady* violation has occurred, the defense must surmount the following hurdle: "[D]elayed rather than absent disclosure of exculpatory information may or may not qualify as a *Brady* violation, depending on whether the defendant can establish prejudice due to his or her inability to use the *Brady* material effectively at trial." *Hirsh*, 310 Kan. at 336. Relying on precedent from other jurisdictions, our Supreme Court has held that as long as the accused has sufficient time to effectively use evidence disclosed immediately

14

before trial or during trial, the belatedly disclosed evidence does not qualify as *Brady* material. *Hirsh*, 310 Kan. at 336. So, when the State delays disclosure of favorable evidence, our Supreme Court has held that the accused must establish that the delayed disclosure of the discovery prejudiced his or her ability to present his or her defense. 310 Kan. at 335-36.

Also, "[o]nce a reviewing court has applied the reasonable probability test to determine if there is a *Brady* violation, there is no need for further harmless error review." *State v. Warrior*, 294 Kan. 484, Syl.¶ 14, 277 P.3d 1111 (2012). There is no need to consider whether the *Brady* violation was harmless because the test whether the disputed evidence was material encompasses the constitutional harmlessness error test. *Warrior*, 294 Kan. at 510. Thus, if the State has failed to disclose material evidence, the accused is entitled to a new trial.

On appeal, Newson contends that this court must reverse his rape conviction and remand to the district court for a new trial based on the State's belated disclosure of the BSPD evidence for several reasons: (1) the time when defense counsel discovered the undisclosed evidence; (2) the "sheer volume" of the undisclosed evidence; and (3) the exculpatory nature of the undisclosed evidence. He argues that it was humanly impossible for his defense counsel to review the evidence that the BSPD gave to her the previous evening. Again, defense counsel stated that she could not start reviewing this evidence until 9:50 p.m. He argues that the belated disclosure forced his defense counsel to haphazardly admit the discovery she had found through the testimony of BSPD officers. And he forcefully argues that the late disclosure of the BSPD evidence hampered his defense counsel's ability to effectively cross-examine Jane. He asserts that if his defense counsel had certain surveillance video and text messages between Jane and John when preparing her defense, the jury would have discredited most of Jane's testimony because defense counsel could prove that Jane was being untruthful.

15

The State's response to Newson's *Brady* violation argument focuses on the fact that Newson received the undisclosed evidence during trial. Relying on our Supreme Court's holding in *Hirsh* that delayed disclosures of favorable evidence may not constitute *Brady* material if the defendant has time to use the evidence, the State contends that Newson had enough time to use the favorable evidence disclosed to him. See *Hirsh*, 310 Kan. at 336. According to the State, because Newson was able to admit some of the photographs, surveillance video, and text messages between Jane and John during his defense, Newson was not prejudiced by the belated disclosure of this evidence around 9:50 p.m. the evening before his defense started.

In his reply brief, Newson repeats that the sheer volume of the evidence withheld until 9:50 p.m. the night before presenting his defense, in and of itself, prevented his defense counsel from effectively representing him. He also points to an ongoing problem with accessing the belatedly disclosed evidence. The record establishes that defense counsel, the jury, the Wyandotte County Clerk's Office, and this court have all had trouble playing the surveillance videos that were belatedly disclosed to Newson. Newson notes that it is possible that the jury was unable to view some of the belatedly disclosed exculpatory and contradictory evidence that he admitted during his defense (1) because he could not publish the disputed evidence and (2) because the jury also had technical problems reviewing the disputed evidence. Indeed, the jury—12 people—had to ask for help how to play a video exhibit admitted into evidence, which they should have been able to easily play from a flash drive.

A. *Additional facts on Newson's efforts to obtain discovery*

Before Newson's jury trial, defense counsel filed three motions to compel discovery from the State. In Newson's third motion to compel discovery, Newson essentially asked for all evidence collected by the BSPD that had any bearing on his criminal charges. Newson asked for all of the BSPD reports, the BSPD video footage, all

of the photographs taken by the BSPD of the crime scene or of text messages, and all other exculpatory evidence the State had. In its March 2020 response to Newson's second motion to compel discovery, the State contended that it had given and would continue to give Newson any discovery, including *Brady* material, if it found such evidence. In reference to any text messages between Jane, John, or Newson, the State asserted that it had given Newson all discoverable material. In doing so, it noted that at Newson's preliminary hearing, Jane testified that she had deleted her text messages to John.

At the second day of evidence at Newson's trial, the only evidence the State presented was John's and Jane's testimonies. Immediately after Jane finished testifying, defense counsel told the district court that she did not believe that the State had turned over all discovery. She believed this based on her conversations with John's attorney, John's testimony that day, and Corporal Christopher Haney's testimony the day before. Defense counsel explained that neither her nor the prosecutor had a photograph of an alcohol bottle. So, she was working with Major Nicholson to see if the BSPD had undisclosed discovery. Then, defense counsel asked the district court for a break to look at any discovery she may obtain:

> "So, I know the court is going to be pushing for going straight from the KBI agent straight into my case, but what I'm trying to say is I'm going to need time to look at those photographs. There's going to have to be a break for me to do that."

Afterwards, the district court did not say anything directly about defense counsel's request for time should she discover exculpatory evidence, like a photograph of an alcohol bottle, at the BSPD. Rather, it noted that it would "take up any motions the defense may have" after the State closed its case.

The next day, defense counsel moved to dismiss Newson's case while explaining that Major Nicholson provided more than 100 photographs as well as many videos

related to the BSPD investigating Newson for raping Jane. She explained that 91 of the photographs were of text messages exchanged between Jane and John between March 16, 2019, and March 29, 2019. She explained that there was video footage from the hotel, from the 7-Eleven, and from BSPD officers' Axon body cameras. She explained that from her initial review, much of this evidence would have helped her cross-examination of Jane. She also explained that she was unable to start reviewing this substantial volume of new evidence that she had received until 9:50 p.m.

A close review of the documents the State and BSPD failed to give defense counsel until the evening after the second day of Newson's jury trial shows that Newson was belatedly given about 220 photographs; those photographs include the text messages between John and Jane as well as photographs of the crime scene. As for new video footage, Major Nicholson gave defense counsel about 315 minutes—over five hours—of video that BSPD officers filmed while investigating Newson for rape. Of note, this calculation excludes the digital video that the State belatedly disclosed but will not play.

As for the photographs of text messages between John and Jane, many of the text messages were flirtatious or involved drugs. John and Jane exchanged texts about bathing and about visiting a pornographic website. In one exchange, John strongly implied that he had seen Jane naked before. Although Jane referred to her boyfriend in some text messages, she also said that her boyfriend was mean. She suggested that her boyfriend would not let her drink alcohol but that she could still smoke "weed." In the text messages sent on March 29, 2019, about planning the hotel gathering, Jane told John that she and her friends "ha[d] a blunt ready" and that they intended to "get fucked up tonight."

In any case, although nothing indicates that the prosecutor reviewed any of the evidence that defense counsel obtained from Major Nicholson, the prosecutor asked the district court to deny Newson's motion. She seemingly argued that the district court

18

should reject Newson's argument because the belatedly disclosed evidence corroborated evidence that the State had already admitted in its case-in-chief. The district court adopted the prosecutor's approach and argument. Although nothing indicates that the district court reviewed any of the evidence that defense counsel obtained from Major Nicholson before denying Newson's motion to dismiss, the district court did so in a lengthy ruling:

"All right. Well, I gotta tell you it disturbs the Court that we are in our fourth day of trial and that there's this evidence that the Bonner Springs Police Department possesses and it was not turned over to the defense.

"They asked for discovery in this matter. Whether it's part of the State's case or not, I believe the law is pretty clear the State has a duty that whatever law enforcement has, they are to turn over to the defense. Especially if it is exculpatory.

"I've not heard [defense counsel] argue that there was a malicious intent on the part of the prosecutor regarding this.

"At best it's probably negligence in the fact that the prosecutor didn't check with the Police Department to determine what, if any, evidence they possessed as far as beyond reports and videos of statements . . . and photographs.

"It appears that [defense counsel] now has all this in her possession, and she's going to be able to present it.

"As far as it being used during the impeachment of [the State's] witnesses, that impeachment has already come out. I think it was very clear. I'm not sure how a photograph of no other bottles in the room would necessarily [*sic*] it can be used and impeach.

"You already have [John] saying there's one bottle. She said there was two. They're already inconsistent with that testimony. You can put this in now, and at this point, a jury will know.

. . . .

"As far as the interaction between the text messages between [Jane] and [John], I think that was clearly put before the jury that there was interactions before.

"*I will say I believe that if there is a text message that says, I have marijuana, I'm bringing it to the room, then that is relevant, and that does go to her consistency of whether she had hit or whether it was that she testified other people*, but the fact that you

19

have that now and can introduce it, I would assume through [Corporal] Haney or whoever collected it, then you'll be able to complete it.

"So, I don't know that your client has been prejudiced at this point, given that you have [John] testified that she had her own blunt, and she introduced it into the rotation of eight blunts that they all smoked at the time.

"The 7-Eleven video, I think there's been plenty of testimony already by [Corporal] Haney or [Officer] Hedrick about how the victim was walking and how she was performing. I don't think she indicated she was necessarily stumbling. . . .

"So, all of that, while it's obviously corroboration to [John's] testimony about it, again, if you're going to put it on now, the jury will have it to look at.

"Again, it's disturbing to this Court that the State didn't have this evidence and turn it over to the defense. It should have been obtained and should have been turned over.

. . . .

"It's all speculation, but given that you now have [the evidence], I'm going to find that I know this case is—it's been a while since I looked at the exculpatory *Brady* material cases, but given that there doesn't appear to be a malicious intent, it appears to be at least a negligence on the part of the State at this point, and the fact that you are aware of it, and you can put it before the jury now, I'm going to deny your motion for dismissal." (Emphasis added.)

During his defense, Newson admitted five exhibits that were disclosed to him the evening before he presented his defense through BSPD officers. The officer who found and then took a photo of a single bottle of a fifth of New Amsterdam vodka that was three-quarters full testified about taking the photo, which was admitted as Defense Exhibit E. Video surveillance from the hotel was admitted as Defense Exhibit F through Officer Brenden Hedrick's testimony. And video surveillance from the 7-Eleven was admitted as Defense Exhibit G through Corporal Haney's testimony. Then, during her direct examination of Corporal Haney, defense counsel asked Corporal Haney a few questions about the photographs he had taken of text messages between John and Jane from March 16, 2019, to March 29, 2019, that were on John's cellphone. Corporal Haney admitted that the photographs indicated that Jane intended to smoke marijuana and drink

alcohol when she went to the hotel. The photographs of the text messages were admitted as Defense Exhibit H. Finally, Newson admitted a video of Corporal Haney giving John a cigarette although he knew that John was a minor as Defense Exhibit I; a different BSPD officer's Axon camera recorded this incident.

After the jury convicted Newson of rape but before Newson's sentencing, Newson moved for a new trial because the delayed disclosure was a *Brady* violation that infringed on his due process right to a fair trial. In his motion, Newson asserted that his trial was fundamentally unfair because the belated disclosure adversely affected his ability to confront adverse witnesses, to present a defense, and to "have a full and fair opportunity to defend himself against the State's allegations." Yet, the district court rejected Newson's argument again:

> "The defense then utilized at least a couple of the—some of that evidence in their case. I don't know what's exactly on here and what would be considered prejudicial. I think I made the comments at the time it—the Court was bothered by the fact that this evidence had not been turned over and the State had not obtained this evidence from the Bonner Springs Police Department. But the issue then becomes is its, as the State pointed out was—is its materiality. Would it have changed the verdict?
>
> "*I've not been presented anything at this point to tell me what exactly is on here*. The State indicated that there were potentially some impeachment material, and that may have been regarding who went where as far as afterwards. But the defense, as I recall, was able to impeach the victim in this case both with the testimony of the codefendant about what occurred in the room regarding—as I said earlier, about whether she had initiated—I think as I recall there was some testimony from him that she had called saying she was bringing some of her own marijuana, that she did participate. She denied it.
>
> "So I'm not sure exactly—and it hasn't been presented today exactly what else is on those photographs or those exhibits, Exhibit J, that would have—that wasn't presented to the jury that would have potentially charged the verdict in this case.
>
> "I think the defense obviously presented to the jury the—some impeachment material to the jury regarding the victim and regarding what occurred, and the jury was

21

able to consider that and gave it what weight they did. But ultimately found, based on her testimony and based on the other testimony in the case, that they were—they believed the State had met its burden.

"*So unless there's something on those that's so clearly exculpatory, so material that it would change the verdict, which I don't have—that's not really been presented to me so I don't know what it is other than what I was—what I recall in the trial*. And I don't recall—I think the defense utilized some of that with—because the State—Defense called Chris Nicholson, Captain Kahn, [Officer Hedrick], [Corporal] Haney in their case. And so they were able to utilize some of that information in their case.

"So at this point, given—I don't believe that the defense has carried its burden to show the Court that the defendant—that *the State, while it may not have turned over and should have been turned over*, *clearly, that it was so prejudicial it deprived him of a fair trial, meaning that this occurred to the point where it was material and the verdict*—I think both of you have put in there that it's the defendant's burden at that point to show that it's—likely would have produced a different result.

"For those reasons, I will deny." (Emphases added.)


B. *Should Newson's rape conviction be reversed?*

Having considered these additional facts, we will consider the merits of Newson's *Brady* violation argument. In a nutshell, there are multiple problems with the district court's reasoning for rejecting Newson's arguments.

To begin with, the district court never considered the evidence that Newson asserted was *Brady* material before denying his mid-trial motion to dismiss or his motion for a new trial. When Newson moved to dismiss the State's charges against him during his trial, it is readily apparent that the district court denied Newson's motion without considering the alleged *Brady* material for two reasons: (1) Defense counsel had just told the district court about the newly disclosed evidence; and (2) the district court used hypotheticals when it denied Newson's motion. Specifically, the district court discussed a hypothetical that "*if* there [was] a text message that says, I have marijuana, I'm bringing it

22

to the room, then that is relevant, and that does go to her consistency of whether she had hit [*sic*] or whether it was that she testified other people." (Emphasis added.)

But as already discussed, the BSPD photographs of the text messages between John and Jane showed that Jane sent John a text message about having "a blunt ready" for the gathering at the hotel. So plainly, the district court had not reviewed the delayed discovery Newson took issue with before it denied his motion to dismiss. As for Newson's motion for a new trial, defense counsel admitted Exhibit J—a flash drive, which contained all the evidence that BSPD gave her, at Newson's sentencing hearing when the district court considered the new trial motion. Nevertheless, it seems that the district court never reviewed the evidence on this flash drive either. Instead, at Newson's sentencing hearing, it explained that it was denying Newson's motion because it had not "been presented anything at this to tell [it] what exactly [was] on [the flash drive]."

A district court must make fact-findings to determine whether the State violated *Brady*. This is why this court's standard of review requires us to defer to the district court's fact-findings while reviewing alleged *Brady* violations. *Hirsh*, 310 Kan. at 333. So, to determine whether a *Brady* violation exists, the district court must consider the evidence that the accused argues is undisclosed *Brady* material. It is an abuse of the district court's discretion to not consider the underlying facts needed to answer the accused's legal argument. See *State v. Horton*, 292 Kan. 437, 440, 254 P.3d 1264 (2011) (holding that it "is an abuse of discretion to refuse to exercise discretion or fail to appreciate the existence of the discretion to be exercised in the first place"). So, the district court's reasons for rejecting Newson's *Brady* violation arguments are all fundamentally flawed; the district court ruled why it was denying Newson's motions before it considered the evidence required to support its rulings.

Next, in addition to the preceding error, when the district court denied Newson's motion to dismiss, it speculated about what evidence would constitute *Brady* material. In

23

doing so, it expressly stated that if there were any text messages from Jane to John about already possessing marijuana, those messages would be "relevant" because it concerned Jane's "consistency of whether she had hit [*sic*] or whether it was that she testified other people." Consequently, the district court recognized, rightly, that any text messages indicating that Jane was bringing marijuana to the hotel would help Newson undermine Jane's credibility. Regarding the district court's ultimate decision that Newson was not prejudiced because he had access to the delayed disclosure material, though, Newson correctly argues that the district court's ruling ignored (1) the extent of the evidence suppressed and (2) the importance of having this evidence before cross-examining Jane.

As already discussed, following the second day of evidence at Newson's jury trial, Major Nicholson of the BSPD gave defense counsel 220 photographs and over five hours of video footage from the hotel, from the 7-Eleven, and from BSPD officers' Axon body cameras. Put plainly, it takes substantial time to skim this amount of material, let alone thoroughly review this material to effectively and zealously represent a criminal defendant on trial for rape, aggravated criminal sodomy, and aggravated sexual battery. On the third day of evidence at Newson's jury trial, defense counsel tried to explain her dilemma. She told the district court that she was only able to start reviewing the new discovery at 9:50 p.m. the previous evening.

Defense counsel should have never been placed in this position. The Sixth Amendment to the United States Constitution guaranteed Newson the right to effective assistance of counsel. Through no fault of defense counsel, the district court limited defense counsel's ability to effectively represent Newson in violation of his right to effective representation. No reasonable person could expect defense counsel to be adequately prepared to defend Newson after being given so much discovery, some of which was clearly exculpatory, late at night the evening before presenting Newson's defense.

24

For this same reason, the State's contention that the evidence from the delayed disclosure was not *Brady* material because Newson was able to effectively use the evidence at this trial is a crowning non sequitur (it does not follow). If we were to take the State's contention seriously, the State could simply delay in turning over *Brady* material to a defendant until after the complaining witness (here Jane is the complaining witness) has testified and has been released from his or her subpoena to appear. Indeed, this is exactly what happened in this case. Here, the State shielded Jane from meaningful cross-examination when it delayed the disclosure of the exculpatory evidence *until after* Jane had been released from her subpoena.

Surely, the State should not be in a stronger position because it delayed in turning over *Brady* material to Newson *until after* Jane was no longer available for cross-examination than the State would have been in if the defense could have cross-examined and impeached Jane's credibility based on her exculpatory and contradictory text messages she had previously made to John. Our Supreme Court has recognized the following important witness credibility factor: "One of the reasons that appellate courts do not assess witness credibility from the cold record is that the ability to observe the declarant is an important factor in determining whether he or she is being truthful." *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008). Thus, Newson's inability to cross-examine Jane due to the State's delayed disclosure of *Brady* material cut off a vital line of impeachment evidence for him to use in testing the truthfulness of Jane's testimony.

Here, defense counsel was asking a law enforcement officer about photographs of text messages he took of a codefendant's cellphone that tend to undermine Jane's credibility about her relationship with the codefendant, John, her marijuana use, and her alcohol consumption, which does not have the same effect as cross-examining Jane, under oath, about those messages. Although the text messages between John and Jane were admitted into evidence, it seems that the jury was able to review the photographs only if it chose to do so by accessing the photographs on a flash drive during

25

deliberations. As previously mentioned, the jury had trouble using the flash drive during its deliberations. So, we cannot be confident that the jury actually saw any of the defense exhibits containing material from the delayed discovery disclosure. Most importantly, the text messages are direct statements from Jane to John. This direct evidence was undoubtedly the best way for the jury to weigh whether Jane's or John's testimony was more credible. As a result, any argument that John's and Jane's text messages to each other merely corroborated previously admitted evidence is illusory.

Also, our Kansas Supreme Court decision that the State relies on to make this illusory argument—*Hirsh*—cites precedent that the opportunity to cross-examine the State's witnesses about the belatedly disclosed evidence is important to the determination whether the delayed disclosure of evidence constitutes *Brady* material. See *Hirsh*, 310 Kan. at 336. Here, the timing of the State's delayed disclosure of the evidence possessed by the BSPD prevented Newson from cross-examining Jane with any of the impeaching and contradictory evidence belatedly disclosed. Thus, the State's reliance on *Hirsh* is clearly misplaced.

Finally, Newson's defense hinged on bolstering John's credibility while impeaching Jane's credibility. Newson wanted the jury to believe John's testimony about what had happened in the hotel room because it was vague. His testimony implied that Jane and Newson may have had consensual sex. So, any evidence that undermined Jane's credibility with the jury while supporting his consensual sex defense would be very important.

Here, when this court reviews John's and Jane's conflicting testimonies in the context of some of the messages that Corporal Haney photographed on John's phone, it seems that Jane either lied at Newson's trial or had no memory of her previous text message conversations with John. For instance, although John testified that he and Jane dated in middle school, Jane testified that she was never John's girlfriend in middle

school. Rather, they were just friends. In a text message, though, John implies that he has seen Jane naked before. Additionally, Jane and John exchanged text messages about bathing and showering. John texted Jane when he was about to get on a porn website. And Jane complained to John that her boyfriend was mean. Concerning Jane's use of marijuana and alcohol during March 29, 2019, and the morning of March 30, 2019, she testified that she did not bring marijuana to the hotel. But in her text messages to John shortly before hanging out at the hotel, Jane tells John that she and her friends were "gonna get fucked up tonight." Jane told John that she and her friends had their own "blunt ready." She also told John if he could get her more marijuana "that would be amazing." This direct contradictory evidence would have called into question Jane's credibility.

As a result, the credibility of Jane and her ability to accurately perceive and to remember the events of March 29, 2019, and the morning of March 30, 2019, were critical to Newson's defense. In a trial where jurors are asked to accept the testimony of a witness, it is certainly proper for the opposing party to introduce evidence affecting the witness' credibility. Accordingly, it is readily apparent that the State interfered with Newson's defense, preventing him from presenting a complete defense when it precluded him from being able to question Jane about her rape accusation against him.

To summarize, there are three elements of a *Brady* violation: (1) that the evidence at issue was favorable to the accused, either because it is exculpatory or useful for impeachment purposes; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the evidence suppressed was material, which means that there is a reasonable probability that if the accused had the evidence, the result of the proceeding would have been different. *Hirsh*, 310 Kan. 321, Syl. ¶ 1. Here, we conclude that the State's violation of *Brady* resulted in Newson not having the best evidence available to effectively present his defense based on undermining Jane's testimony and strengthening John's credibility with the jury. When compared to her testimony, Jane's

text messages impeached her credibility. Given this factual scenario and that the evidence against Newson was not overwhelming, there is a reasonable probability that the jury would have acquitted Newson of rape if he had timely access to the text messages to properly incorporate the messages into his consensual sex defense. Indeed, the probability that the jury would have reached a different outcome seems especially reasonable since the jury acquitted Newson of aggravated criminal sodomy.

As a result, we reverse the district court's denial of Newson's new trial motion asserting that the State violated *Brady* for the following reasons: (1) The district court did not review the belatedly disclosed evidence before it denied Newson's motion; (2) the district court ignored that the amount of evidence that the State belatedly disclosed during the middle of Newson's jury trial would prevent any defense attorney from presenting an effective defense as meant under the Sixth Amendment to the United States Constitution; (3) the district court ignored that the content and the timing of the discovery of the *Brady* material prevented Newson from exercising his right to confront adversarial witnesses under the Sixth Amendment to the United States Constitution; and (4) the district court ignored that if Newson had the undisclosed text messages when Jane testified, Newson would have severely impeached Jane's credibility.

II. *Did the prosecutor commit reversible error during closing arguments and does cumulative error otherwise require reversal of Newson's rape conviction?*

When a defendant argues prosecutorial error on appeal, this court considers the defendant's argument in two steps. First, this court considers whether the prosecutor's conduct fell outside the wide latitude that prosecutors have when presenting the State's case. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Second, if the defendant establishes that the prosecutor erred by engaging in conduct outside this wide latitude, then this court must consider whether the error was harmless under the constitutional harmlessness error test. 305 Kan. at 109. Under the constitutional harmlessness error test,

an error is harmless if the State can establish that the prosecutor's error did not affect the outcome of the defendant's trial in light of the entire record. 305 Kan. at 109.

Previously, our Supreme Court has held that a prosecutor must be careful when using phrases like "we know," "we submit," "I know," and "I submit" during closing arguments to the jury. See *State v. King*, 308 Kan. 16, 34, 417 P.3d 1073 (2018); *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006). Although a prosecutor may use phrases like "we know" and "I submit" when the prosecutor is speaking about uncontroverted evidence, a prosecutor cannot use these phrases to give the prosecutor's personal opinion. *King*, 308 Kan. at 34; *Corbett*, 281 Kan. at 315-16. A prosecutor also errs whenever the prosecutor makes an argument that draws inferences for the jury about controverted evidence using such phrases. *King*, 308 Kan. at 34-35.

During closing arguments, the district attorney made some statements using these controversial phrases. Newson takes issue with the prosecutor saying that the "State submits to you what's not in dispute is that on that day, on that night . . . the defendant raped and sodomized [Jane]." He takes issue with her statement, "I submit to you we have proven [the] elements [of rape and the elements of aggravated criminal sodomy]." He takes issue with the prosecutor stating that "[t]here was a lot going on, . . . but what we do know is [he] raped [Jane] and sodomized [Jane]." He also takes issue with the prosecutor's repeated statements that he did not ask for consent and Jane never gave him consent. Newson rightfully points out that by pleading not guilty to rape and arguing that he and Jane had consensual sex, whether he and Jane had consensual sex was a controverted fact. In addition, he stresses that the State's case against him hinged on Jane's credibility. He stresses that the prosecutor's errors involve interjecting her personal opinion about Jane's credibility. So, under the assumption that this court rules that the prosecutor's disputed comments were erroneous, he argues that the State cannot prove the prosecutor's errors were harmless.

29

The State's response to Newson's prosecutorial error arguments ignores his complaint about the prosecutor saying, "[The] State submits to you what's not in dispute is that . . . the defendant raped and sodomized [Jane]." The State also never responds to Newson's argument about the prosecutor stating, "I submit to you we have proven [the] elements [of rape and the elements of aggravated criminal sodomy]." Instead, the State wrongly contends that Newson only challenges the prosecutor's statement that "[t]here was a lot going on, . . . but what we do know is [he] raped [Jane] and sodomized [Jane]." Regardless, as to this last statement, the State expressly concedes that the prosecutor violated our Supreme Court's precedent in *King* that a prosecutor may not use such phrases indicating the prosecutor's opinion on controverted evidence. But by making this concession, the State implicitly concedes that the statements Newson challenges, which the State has not addressed, clearly violates the *King* holding.

As Newson asserts in his brief, the State cannot meet its burden of proving harmless error. Because the prosecutor's errant comments alleged that the State had already established that Newson had raped Jane, the prosecutor's errant comments bolstered Jane's credibility. This was improper vouching for Jane's credibility. Our Supreme Court has condemned the practice of inappropriately bolstering the credibility of a witness. Thus, a prosecutor may not bolster the credibility of a witness. *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015) (Prosecutor's comments in closing argument bolstering the credibility of witnesses are improper.). Because the prosecutor's errant comments bolstered Jane's credibility and Newson's defense sought to impeach Jane's credibility with the jury, the State's harmless error argument about the strong evidence supporting Newson's rape conviction fails.

Relatedly, because the prosecutor's errant comments bolstered Jane's credibility and Newson's defense hinged on impeaching Jane's credibility with the jury, the prosecutor's errant statements magnified the harm stemming from the State's *Brady* violation. In short, Newson was denied the best evidence he could use to improve John's

30

credibility while impeaching Jane's credibility—the text messages between John and Jane. *And then*, the prosecutor made errant statements during closing arguments that bolstered Jane's credibility. As a result, the harm caused from the State's *Brady* violation aggregated with the harm caused by the prosecutor's improper statements during closing arguments is cumulative error. See *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022) (explaining how cumulative error involves the aggregated harm of multiple errors within a proceeding). Thus, under the doctrine of cumulative error, the prosecutor's errant statements during closing arguments combined with the harm stemming from the State's *Brady* violation requires the reversal of Newson's rape conviction too.

Reversed and remanded for a new trial.