NOT DESIGNATED FOR PUBLICATION

No. 127,934

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANILO ANTONIO VARGAS,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID DAHL, judge. Submitted without oral argument. Opinion filed June 12, 2026. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE and ATCHESON, JJ.

MALONE, J.:  Danilo Antonio Vargas appeals his conviction of aggravated battery following a jury trial. Vargas claims the district court erred by denying his motion for mistrial and motion for new trial based on an alleged *Brady* violation. See *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). He also claims the district court erred by denying his motion for new trial based on his claim of ineffective assistance of trial counsel. After thoroughly reviewing the record and the parties' arguments, we reject Vargas' claims and affirm the district court's judgment.

1

*Factual and procedural background*

On March 20, 2022, Vargas was working as a maintenance man at a Super 8 motel in Wichita. Vargas was also living at the motel at that time. That day, he was working on the plumbing in several different rooms when he noticed that some of his personal items had been stolen, including his cellphone, a drill, and some other tools. He went to the front desk to see if the security cameras had captured the culprits in action. The security videos showed a man and a woman walking in and out of the room where Vargas had left his belongings. While watching the footage, Vargas told the hotel manager that he was going to shoot "whoever did it." He made a similar comment to another employee.

After Vargas reported the theft to the police, Officer Dalton Roberts responded to the motel to investigate the theft. Vargas told Roberts that he thought he recognized the woman in the security video as a recent hotel customer. He later identified a mugshot of the woman in question.

The next morning, Vargas received a telephone call from an unknown person who asked him, "'Do you want your stuff back?'" The caller told him to go to the parking lot of the Aspen Heights apartment complex and to bring cash to buy back his things. The caller told him, "'When you get there, make sure you let me know you're there and I'm going to give you step instructions. Don't get out of the car unless I tell you to.'"

Vargas drove to the apartment and parked. A man exited a nearby vehicle and began to approach him. Nervous with the situation, Vargas exited his car when the man told him to do so, but he then noticed another individual in a nearby truck, who Vargas believed to be armed. The man in the parking lot began asking where the money was and Vargas told him to back up. Vargas later testified that he feared for his life and thought he had been set up, so he pulled out his gun. Vargas then fired two shots. Vargas later explained, "[M]y only instinct at that moment was to fire my gun as a warning shot to

2

push him back so I can go home and get out of that situation." At that point, Vargas returned to his car and drove back to the Super 8 motel, where he would eventually turn himself over to police investigating the shooting. The entire incident was recorded by two different security cameras at the apartment parking lot.

When police responded to the scene of the shooting, they found the man who had been shot, Craig Cousins. Cousins initially told Officer Trenton Roth that he did not know who shot him—he then stated that the shooter was a maintenance man at the Super 8 motel. Cousins said he recognized Vargas from the motel but that he did not know him. He explained that Vargas had accused him of stealing from him, then quickly pulled out a gun and shot at him. Roth took some photographs to document Cousins' injury while they waited for paramedics to arrive. After the paramedics arrived, Cousins was taken to the emergency room, where he recovered without any need of surgical intervention.

On March 24, 2022, the State charged Vargas with one count of aggravated battery based on knowingly causing great bodily harm, a severity level 4 person felony. But after a preliminary hearing, Vargas was bound over on one count of aggravated battery and one count of attempted murder in the first degree.

At trial, the State asserted that Vargas blindly sought revenge for the theft of his property and resorted to shooting Cousins at point-blank range based on a mere suspicion of his involvement. Vargas relied on a theory of self-defense, emphasizing the scheme to extort him for the return of his property and his belief that he was in imminent danger when he fired his gun in the apartment parking lot.

The State's case rested heavily on Cousins' testimony. Cousins, who had initially given the police and paramedics a false name, claimed he was in the apartment parking lot to help a friend with a broken truck. He testified that he did not know Vargas, had never talked to him, and did not have any of Vargas' possessions that had been stolen the

3

prior day. Cousins added that he had no idea why Vargas would shoot him. He testified that when Vargas pulled into the parking lot, he went over to Vargas' car "to see what was going on." He recalled that Vargas got out of his car and immediately drew a gun on him. Cousins began backing up, but Vargas fired two shots, one of which hit him in the leg.

During cross-examination, Vargas' counsel asked Cousins how many crimes of dishonesty he had been convicted of, and Cousins replied, "I'm not sure. Maybe a couple of them." Cousins admitted that he had convictions for theft, check fraud, and burglary. Vargas' counsel raised a *Brady* objection, asserting that the State had not disclosed Cousins' check fraud conviction in discovery. The prosecutor responded that his office had performed a standard background check, which had revealed that Cousins had two theft convictions. The prosecutor then commented that even if Vargas' counsel had discovered additional convictions during cross-examination, then there was no *Brady* violation because counsel was now aware of the additional convictions. The district court then stated, "[T]here isn't a *Brady* violation" without further elaboration. Vargas' counsel continued with his cross-examination of Cousins.

On the second day of trial, after Cousins had completed his testimony, Vargas' counsel told the district court that he had discovered that Cousins had a California conviction for robbery, but he explained that Vargas would not object to a stipulation of Cousins' robbery conviction rather than recalling him to the stand. Still, Vargas' counsel again moved for a mistrial which the district court denied. The parties later agreed to enter a stipulation regarding Cousins' prior conviction, which stated:

> "'The following facts have been agreed to by the parties and are to be considered by you as true. The FBI database shows a Craig Cousins with the same date of birth and Social Security number as the witness who testified in this case on January 23rd of 2024 has a

4

prior conviction for robbery on July 21, 2005, in the State of California in violation of the California Penal Code 211.'"

Vargas testified in his defense. He asserted that Cousins was part of the scheme to rob him, claiming Cousins immediately began asking him where the money was when Vargas arrived at the apartment parking lot. Vargas acknowledged that Cousins never pulled out a weapon of his own or touched him during the incident. He also acknowledged that the other man who Vargas believed was armed never exited the truck, but Vargas insisted that he feared for his life when he decided to use his gun.

After both parties rested, the district court instructed the jury on several lesser included offenses of both aggravated battery and attempted first-degree murder. The jury found Vargas guilty of aggravated battery with a deadly weapon, one of the lesser offenses of aggravated battery based on knowingly causing great bodily harm, but it acquitted him of the attempted murder charge.

Following trial, Vargas filed a pro se motion for new trial, raising issues of prosecutorial misconduct, ineffective assistance of counsel, and judicial misconduct. The primary focus of Vargas' argument was his trial counsel's failure to raise a motion for self-defense immunity. Vargas' trial counsel also filed a motion for new trial, in which he reraised the *Brady* issue relating to Cousins' belatedly discovered robbery conviction. The district court appointed Vargas new counsel to represent him on the motions.

The district court held a hearing on the motions for new trial, at which Vargas' trial counsel, Stephen Brave, testified. Brave testified that he did not file a motion for immunity from prosecution for two main reasons. First, he did not think there was a high likelihood that the motion would be granted. Second, he wanted to limit the State's ability before trial to question Vargas on the stand. Ultimately, the district court denied Vargas' motions for new trial, finding that (1) a motion for self-defense immunity would have

5

been denied and Brave was not ineffective for not filing such a motion; and (2) the belated disclosure of Cousins' robbery conviction did not prejudice Vargas.

On June 21, 2024, the district court sentenced Vargas to 13 months' imprisonment but granted probation for 24 months to be supervised by community corrections. Vargas appeals the district court's judgment.

*Did the district court err by denying Vargas' motion for mistrial and motion for new trial based on an alleged* Brady *violation?*

Vargas first claims the district court abused its discretion by denying his motions for a mistrial and a new trial based on the State's belated disclosure of evidence related to the criminal history of one of its witnesses. The State maintains the district court did not abuse its discretion in denying Vargas' motions because it correctly found that no *Brady* violation had occurred and that Vargas was not prejudiced by the late disclosure of the witness' criminal history.

A district court may order mistrial when "prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). And a district court may grant a new trial to a defendant "if required in the interest of justice." K.S.A. 22-3501(1). An appellate court reviews a ruling on a motion for mistrial for an abuse of discretion, but the district court's ruling on the existence of a *Brady* issue is reviewed de novo. *State v. Hirsh*, 310 Kan. 321, 333, 446 P.3d 472 (2019). Likewise, an appellate court reviews the district court's decision on a motion for new trial based on an alleged *Brady* violation for an abuse of discretion. *State v. Breitenbach*, 313 Kan. 73, 97, 483 P.3d 448 (2021).

The Kansas Supreme Court's summary of the "analytical steps" of a *Brady* analysis is well-established:

6

"7. . . . [P]rosecutors have a positive duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

"8. Because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement.

"9. Evidence that is favorable to the accused encompasses both exculpatory and impeachment evidence. For *Brady* purposes, there is no distinction between these two types of evidence that are favorable to the accused; thus, impeachment evidence is considered exculpatory.

"10. There are three components or essential elements of a *Brady* violation claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.

"11. Under the test for materiality governing all categories of *Brady* violations, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Warrior*, 294 Kan. 484, Syl. ¶¶ 7-11, 277 P.3d 1111 (2012).

Vargas moved for a mistrial due to the alleged *Brady* issue during his trial and raised the issue again in his posttrial motion for a new trial. In both instances, the district court denied Vargas' motion, explaining that there was no *Brady* violation because Cousins' robbery conviction was belatedly disclosed and Vargas used that information as part of his defense. The district court also repeatedly noted that it did not believe that the evidence of Cousins' prior conviction was exculpatory.

In discussing this issue, both parties cite the Kansas Supreme Court's discussion of the distinction between undisclosed *Brady* material and belatedly disclosed material in *Hirsh*, 310 Kan. at 335-36. Relying on precedent from other jurisdictions, our Supreme Court held that a delayed disclosure of evidence "may or may not qualify as a *Brady*

7

violation, depending on whether the defendant can establish prejudice due to his or her inability to use the *Brady* material effectively at trial, as well as an appeal at the state or federal appellate court in which the issue arises." *Hirsh*, 310 Kan. at 336. In other words, so long as the defendant is able to effectively use the belatedly disclosed evidence, then the evidence has not been suppressed within the meaning of *Brady*. Thus, when, as here, the evidence is discovered or disclosed, our Supreme Court has held that the accused must establish that the delayed disclosure of the discovery prejudiced their ability to present their defense. *Hirsh*, 310 Kan. at 335-36.

Vargas concedes that the impeachment evidence at issue was disclosed at trial and was ultimately presented to the jury through a stipulation, but he contends that his trial counsel's efforts were hindered by the belated disclosure. In support, he cites his trial counsel's testimony from his motion for a new trial in which he stated that had he known about Cousins' additional conviction before trial, he "would've taken this case completely different. It would've been a different scenario from beginning to end." Counsel did not elaborate on this conclusory statement. Considering the fact that Vargas' counsel was able to use the information in his cross-examination of Cousins and highlight the conviction in his arguments, this argument is not convincing.

Any prejudice Vargas suffered as a result of the belated discovery did not compromise his ability to have a fair trial. Vargas' trial counsel was able to cross-examine Cousins about his criminal record except for the robbery conviction which was submitted by stipulation, and Vargas chose not to recall Cousins to address that conviction. The evidence of Cousins' robbery conviction was impeachment evidence, but the value of that evidence was lessened by the fact that Cousins' other convictions for crimes of dishonesty had already been established during cross-examination. And, regarding whether his right to cross-examination was hampered, Vargas could have recalled Cousins to the stand to cross-examine him again but chose to stipulate to the robbery conviction instead.

Moreover, the fact that the jury was presented video evidence of the shooting lessened the impact of any inconsistencies about the incident between Cousins and Vargas, as the jury could view the incident for themselves. There is no reasonable probability that the outcome of the proceeding would have been different had the State discovered and disclosed the robbery conviction before trial. See *Warrior*, 294 Kan. 484, Syl. ¶ 11. The delayed disclosure of Cousins' additional convictions does not undermine confidence in the verdict, especially considering Vargas obtained an acquittal of the attempted murder charge. Because Vargas cannot establish prejudice stemming from the delayed disclosure of Cousins' additional convictions for crimes of dishonesty, we conclude the district court did not abuse its discretion in denying his motions for a mistrial or new trial based on the State's alleged *Brady* violation.

*Did the district court err by denying Vargas' motion for new trial alleging ineffective assistance of trial counsel?*

Vargas next claims the district court abused its discretion by denying his pro se motion for new trial, in which he alleged that he received ineffective assistance of trial counsel. His argument is based mainly on Brave's decision not to file a motion for self-defense immunity under K.S.A. 21-5231, which Vargas asserts was not based on any reasonable strategic decision. The State maintains the district court properly denied Vargas' motion, arguing Vargas failed to establish that Brave was ineffective or that Vargas was prejudiced by Brave's decision not to file the motion.

A district court may grant a defendant a new trial "if required in the interest of justice." K.S.A. 22-3501(1). Appellate courts review a district court's ruling on a motion for a new trial for an abuse of discretion. An abuse of discretion will only be found if the district court's decision is based on an error of fact or law or if its decision is arbitrary, fanciful, or unreasonable. *State v. Butler*, 307 Kan. 831, 852, 416 P.3d 116 (2018).

9

The Sixth Amendment to the United States Constitution, applicable to state proceedings via the Fourteenth Amendment, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." And the Sixth Amendment guarantees more than the mere presence of counsel; it mandates "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The two-prongs of the test are well-established:

> "'The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation omitted.]
>
> "'[Under the second prong of the test for ineffective assistance of counsel], the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citations omitted.]'" *State v. Schaefer*, 305 Kan. 581, 596-97, 385 P.3d 918 (2016).

When, as here, the district court conducts an evidentiary hearing on a defendant's motion for a new trial, an appellate court reviews its underlying factual findings for substantial competent evidence and its legal conclusions based on those facts de novo. *Butler*, 307 Kan. at 853. "'Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.'" *State v. Talkington*, 301 Kan.

10

453, 461, 345 P.3d 258 (2015) (quoting *State v. Bird*, 298 Kan. 393, 399, 312 P.3d 1265 [2013]).

In his pro se motion, Vargas asserted that his trial counsel was ineffective because he "[d]id not make a [m]otion [b]efore trial to dismiss the case on account of that [defendant] had invoked his constitutional right of self-defense immunity, right from the time he turned himself over to the police." Following the evidentiary hearing, where Vargas was represented by new counsel and Brave testified about his trial strategy, the district court denied the motion for new trial. In a subsequent order explaining its ruling, the district court explained that Brave had provided "remarkably strong" representation, that his decision not to file a motion for self-defense immunity did not fall below the standards for effective counsel, and that such a motion would have been denied if it had been filed.

At the hearing, Brave testified that he decided not to file a motion for immunity from prosecution for two main reasons: First, he did not think there was a high likelihood that the motion would be granted. Second, he wanted to limit the State's ability before trial to question Vargas on the stand. When counsel's decision can be categorized as a strategic decision made following a thorough investigation of the law and facts of the particular case, that decision is virtually unassailable. See *State v. Cheatham*, 296 Kan. 417, 431, 437, 292 P.3d 318 (2013) (citing *Strickland*, 466 U.S. at 690-91). Vargas bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy. See *Sola-Morales v. State*, 300 Kan. 875, 888, 335 P.3d 1162 (2014).

Brave testified that he was familiar with the statutory provisions related to immunity from prosecution based on self-defense. He explained that based on his review of the video footage of the shooting, it appeared that Vargas had been the initial aggressor. He also explained that his review of the law and evidence led him to the conclusion that there was not a strong likelihood of success for an immunity motion.

11

Brave reasoned that the chance of success was outweighed by the potential danger of Vargas being overexposed to cross-examination by the State. He explained that if he had filed an immunity motion "[t]he State would then get a second crack at him at trial." The video footage of the shooting included in the record confirms Brave's assessment of the likelihood of success of an immunity motion as it shows Vargas exiting his vehicle with his gun already raised and firing shots at Cousins, whose hands were at his side.

Vargas asserts this rationale does not make Brave's decision not to file an immunity motion a valid strategic reason because the decision of whether to testify ultimately belonged to him. But he is conflating two concepts. There is no question that it was Vargas' decision to testify. But Brave's decision was aimed at ensuring the State only had one chance to cross-examine Vargas if he decided to exercise that right. In other words, Brave's decision was not to prevent Vargas from testifying but to protect him by limiting the State's ability to use his testimony against him.

The record shows that Brave was aware of the facts and the law and made a strategic decision not to file a motion for immunity from prosecution. While Vargas may now disagree with that decision, it cannot be said that it fell below the standard of effective representation. Because Vargas failed to establish that Brave rendered deficient performance based on his decision not to file a motion for self-defense immunity, the district court did not abuse its discretion in denying his motion for new trial.

Affirmed.

12